GEORGE K. GANN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 88986. Promulgated February 16, 1940.

M. D. Hanley, Esq., R. W. Burgeson, Esq., and W. W. Patterson, Esq., for the petitioner.

F. F. Korell, Esq., for the respondent.

OPINION.

MELLOTT: The Commissioner determined a deficiency of $4,805.30 in petitioner's income tax for the year 1935. The amended petition alleges that the respondent erred in disallowing $2,057.14 of $10,376.42 deducted by petitioner in his return as ordinary and necessary expenses of carrying on his business, the expenditures having been made for food, rent, liquors, and boat operation; that he erred in disallowing $265 expended by petitioner as club dues, paid for membership maintained exclusively for the purpose of entertaining business guests; and that he erred in including in gross income $150,000 received by petitioner in connection with the termination and cancellation of a certain contract.

No evidence was introduced upon the first issue, so it must be treated as abandoned. The second issue was inferentially reduced to a claim that a deduction of $162 should be allowed for dues paid to the Chicago Athletic Club, and the third issue was presented in several alternatives which will hereinafter be referred to in more detail.

There is no substantial dispute as to the facts, many of them being admitted in the pleadings or shown in exhibits thereto attached or introduced in evidence before us. We shall therefore simply recite the basic facts, after which the respective contentions of the parties will be discussed.

Petitioner is a resident of Chicago, Illinois, and duly filed his return of income for the calendar year 1935 with the collector of internal revenue for the first district of Illinois. The tax shown to be due upon the said return was paid.

In his income tax return petitioner reported a capital gain of $90,000. In other words, he included in gross income for the purpose of computing his net income but $60,000 of $150,000 received by him from his employer, Theodore Gary & Co., under the circumstances hereinafter set out, on the theory that this was the entire amount necessary to be included under section 117 (a) of the Revenue Act of 1934, his contention being that he had made a sale or exchange of a capital asset, which had been held for more than five years but not for more than ten years. The section relied upon is as follows:

SEC. 117. CAPITAL GAINS AND LOSSES.

(a) GENERAL RULE.—In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net income:

\*          \*          \*          \*          \*          \*          \*

40 percentum if the capital asset has been held for more than 5 years but not for more than 10 years.

The circumstances surrounding the receipt of the $150,000 referred to in the preceding paragraph are as follows:

Prior to October 29, 1930, petitioner was an employee of Theodore Gary & Co., a Missouri corporation, sometimes hereinafter referred to simply as the company. It was engaged in the purchase, management, and operation of telephone systems and properties throughout the world and in the manufacture, rental, and sale of telephone and electrical equipment. Petitioner had been engaged in the telephone business, either as an employee of the company or in some other capacity, continuously since June 1, 1903. On October 29, 1930, petitioner and the company entered into a written contract which provided that petitioner's duties, between June 22, 1930, and July 1, 1935, should be of an executive, supervisory, and directory character, to be determined by the company's board of directors or its executive committee, "and to which he may be fully elected or called by the corporate entity or enterprise to be served", but which should not be such as to prevent him from establishing and maintaining a residence in Chicago. The company agreed to pay, or cause to be paid to him, as compensation, a salary of $30,000 per year and to reimburse him for all reasonable traveling expenses and out-of-pocket expenses incurred by him. The contract further provided that no personal investments should be made by him, or his immediate family, which would "conflict in any way with the aims or business of" the company or of its subsidiaries or associated companies, and that the company should be paid by him "the sum of Five Thousand Dollars for each month of the unexpired term of this contract as liquidated damages" in case of his willful failure or refusal, while physically fit, to devote his time and efforts to the company's business. The last clause was premised upon "the intimate knowledge of the business of" the company possessed by Gann and "on account of the particular personal qualifications of the Second Party [Gann] and his adaptation to the nature of the services to be rendered hereunder, the parties hereto deem and declare it to be impossible to measure, with any degree of justice and certainty, the damage which would arise from a breach of this contract by Second Party." The contract provided that Gann should "devote all his time and attention to the business" of the company and that he should not, without its written consent "engage in or carry on any profession or other business, or trade, except in personal investments that do not require any substantial amount of managerial time or attention." It also contained provisions for the selection of arbitrators in the event of disagreement between the parties "with respect to the interpretation of the terms of" the contract "or the performance thereof."

Clause ninth of the agreement reads as follows:

NINTH: The subsidiaries of party of the First Part and companies controlled by it are under the management of a certain partnership, Theodore Gary & Co., composed of the executives of Party of the First Part and certain of its subsidiary companies. It is contemplated that during the life of this agreement it may be to the mutual advantage of the parties hereto that Second Party become a member of said partnership and to that end it is agreed that during the life of this agreement the parties hereto shall give consideration to Second Party joining said partnership as a member thereof, and if Second Party shall become such a partnership member, then, in that event, this agreement shall be thereby cancelled.

Under date of September 9, 1931, the above agreement was modified and extended to December 31, 1941, by the execution of another contract. Clauses 2, 3, and 4 of this contract are as follows:

2—It is agreed by the parties that in addition to the intention as expressed in Section 9 of the former agreement that the parties shall also consider from time to time and attempt to mutually agree upon a basis whereby the second party shall not only join the partnership of Theodore Gary & Co., referred to in said Section 9, but the parties shall also attempt to mutually agree on a plan under which second party may become a member of the Missouri partnership known as Gary & Co. (hereinafter referred to as Mopar). It is recognized that Section 9 of the former agreement and this section must of necessity be an evidence of intention and that no execution can be had under Section 9 or this clause except by mutual agreement.

3—It is agreed that pending any change by mutual agreement of the parties hereto in accordance with the intentions expressed in Section 2 above, that first party shall pay to second party in lieu of the salary of thirty thousand dollars per annum specified in the Third Section of the former agreement a salary of forty thousand dollars per annum from September 1, 1931, until September 1, 1932, and for the next year forty-five thousand dollars per annum, and for the next year fifty thousand dollars per annum, after which the aforesaid sum of fifty thousand dollars per annum shall constitute the annual minimum salary to be paid party of the second part, and it is agreed that on and after September 1, 1934, the parties will consider annually whether, having regard to the size of the company's business, and the results obtained, and the position and work being done by second party, the same minimum salary of fifty thousand dollars per annum shall be increased. It being the intention that (unless by mutual agreement the second party shall enter into the partnership as evidenced by the intention of Section 2 above) the salary shall be adjusted from time to time so as to be a reasonable, adequate, and commercial salary for the work and responsibility of the second party, taking into consideration the factors referred to above and any and all other relevant factors existing at the time.

It is expressly agreed that in considering the question of a revision of the aforesaid minimum salary of fifty thousand dollars per annum that the party of the first part retains full discretion to act according to its best judgment, after giving full consideration in good faith to all existing facts.

4—It is agreed that in the event Mopar sells the control of first party to interests other than Theodore Gary & Co. (New York partnership) that the second party may if he elects, terminate this agreement by giving, not later than three months after second party has knowledge of said sale, notice in

writing to first party of his election to terminate the agreement and unless said notice is so given by second party the agreement shall continue regardless of said sale.

On October 1, 1934, another contract was executed, which, omitting formal parts and signatures, provides as follows:

WITNESSETH:

It is mutually agreed between the parties as follows:

(1) The parties hereby agree that in the event party of the first part pays, or causes to be paid to the party of the second part, at times hereinafter mentioned, the sums referred to, totaling Two Hundred Thousand Six Hundred Eighty-seven Dollars and Ninety-eight Cents ($200,687.98), then, and in that event, the agreement now existing between parties of the first and second part (dated on the twenty-ninth day of October, 1930, as amended the ninth day of September, 1931, covering employment by the first party of the second party for the period of years ending December 31, 1941) is forthwith cancelled, as hereinafter set out. The sums referred to are:

Fifty Thousand Six Hundred Eighty-seven Dollars and ninety-eight Cents ($50,687.98) on or before the 31st of December, 1934, and Seventy-five Thousand Dollars ($75,000) on January 15, 1935, and Seventy-five Thousand Dollars ($75,000) on January 15, 1936. Provided such payments are made on the dates above mentioned (and in the event the dates should be on a Sunday or holiday, then on the first next preceding business day) it is agreed that the above mentioned agreement dated the twenty-ninth day of October, 1930, as amended the ninth day of September, 1931, is forthwith cancelled and the party of the second part acknowledges that for good and valuable consideration he has remised, released and forever discharged and by these presents does, for himself, his heirs, executors, and administrators, remise, release and forever discharge the said Theodore Gary and Company and its subsidiary and affiliated companies, and its or their successors and assigns, of and from all rights, actions, cause and causes of action, suits, debts, dues, sums of money, covenants, controversies, agreements, promises, damages, claims and demands, whatsoever, in law or in equity, which he now has with or against the said Theodore Gary and Company, its said subsidiary or affiliated companies, or ever had, or which his heirs, executors, or administrators hereafter can, shall or may have, for, upon or by reason of any matter, cause or thing whatsoever, from the beginning of the world to the date of these presents, under or by reason of a certain contract of employment entered into by and between the said Theodore Gary and Company and the said George K. Gann, under date of October 29, 1930, as amended September 9, 1931.

In the event of the death, or permanent disability of the party of the second part occurring prior to January 15, 1936, Theodore Gary and Company obligates itself to make the above payments referred to, totaling the sum of Two Hundred Thousand Six Hundred Eighty-seven Dollars and Ninety-eight Cents ($200,-687.98), to said second party or his estate at the dates above set out.

In the event that the payments do not become obligatory by reason of the death or permanent disability of the second party under the preceding paragraph, and in the event that Theodore Gary and Company does not pay or cause to be paid the total sum of Two Hundred Thousand Six Hundred Eighty-seven Dollars and Ninety-eight Cents ($200,687.98), as above set out, then the contract dated October 29, 1930, as amended September 9, 1931, between first and second parties shall remain in full force and effect, and any payments made or caused to be made by first party hereunder or as compensation for services

of second party from October first, 1934, to January 15, 1936, shall be construed to be payments on account of the above mentioned original contract, as amended, between first and second parties, dated October 29, 1930, as amended September 9, 1931.

The $50,687.98 specified in the above agreement was paid during the year 1934 and is not the subject of controversy herein. The remainder of the amount, or $150,000, was paid to petitioner during the year 1935.

It is not clear from the evidence whether petitioner continued in the employ of the company after the execution of the contract of October 1, 1934, or not. In answer to the question whether he was with it at the time of the hearing he stated: "I have done some work for some of their subsidiaries, yes." He also related that he "went to South America in 1935 and spent some three months there and in the West Indies; and then various of them came up here as I recall it. You were asking me about 1935." At one place in the record he referred to a visit or a business trip made to Chicago by representatives of a South American republic, apparently in 1935. Substantial amounts were deducted by him from his gross income for entertaining such business guests, some of whom he stated stayed with him for six weeks and were entertained by him on his boat. At another place in the record he spoke of threats of "expropriating our telephone systems * * * confiscating them unless we are willing to make a certain kind of deal. Now the kind of deal they would like to have us make—," at which juncture his counsel properly stated: "Now, we are not going into that." We point this out for the bearing it may have upon petitioner's contention that he gave up his rights to participate in the pension plan of Theodore Gary & Co., which must of necessity be discussed and which the evidence shows was substantially as follows:

The company had adopted a "Plan for Employees' Pensions, Disability Benefits and Death Benefits", effective as of December 2, 1932. In so far as important herein, it provided for the deposit of certain amounts by the company, based upon its pay roll, in a fund to be administered by a committee of employees. Section 5, paragraph (1) (b), of the document specifying the terms and conditions under which the employees participate provides:

Any employee whose term of employment has been thirty years or more, or any male employee who has reached the age of fifty-five and whose term of employment has been twenty-five or more years, * * * may, at the discretion of the committee and with the approval of the President or of a vice-president designated by the President, be retired from active service and granted a pension.

Paragraph 2 of the same section provides that the "annual pension allowance for each employee retired with a pension on account of age,

length of service or disability" shall be a certain percentage of his average annual pay with a proviso to the effect that $30 per month shall be the minimum and $200 per month the maximum.

The petitioner alleges that the company had established and invariably followed the practice of not limiting retiring employees to the $200 per month maximum, paying, or causing them to be paid, from the fund, the percentage based upon years of service and salary. He therefore alleges that in terminating his contract of employment with the company he gave up not only his right to receive a pension of $200 per month, but really the right to receive $1,535.08 per month during the remainder of his life. His exact age was not shown; but the evidence does establish the fact that he would have been more than 55 years of age on December 31, 1941.

Upon brief counsel relies only on the showing which was made to the effect that a man 50 years of age in December 1935 could have purchased a life annuity paying him a monthly life income of $200 per month, without refund, at a cost of $26,007.80. This figure is important only in connection with petitioner's last alternative contention.

While petitioner, as stated above, included $60,000 of the $150,000 in his gross income he now alleges that he erred in doing so and asks that we find he has made an overpayment in his tax for the year in question. He divides his argument into five parts as follows: (1) That the $150,000 was not income from services and was not a gain or a profit but was paid by the company to be relieved of its obligation under the contract and was received by him as an amount that placed him in no better or worse position; (2) that the amount not being derived from capital, from labor, or from both combined, it is not income within the meaning of that term as construed by the Supreme Court in *Eisner* v. *Macomber*, 252 U. S. 189, and *Bowers* v. *Kerbaugh-Empire Co.*, 271 U. S. 170; (3) that it does not come within the provisions of section 22 (a) of the applicable revenue act unless the last portion thereof be given a broader construction than the words used should be given; (4) in the alternative, that he correctly reported only 40 percent of the amount because he made a "sale or exchange" of a capital asset when he terminated the contract of employment; and (5) as a final alternative that he is entitled to deduct as a loss at least $26,007.80 if it should be held that the $150,000 represented a gain or profit to him. These contentions will be considered briefly in the order stated.

Petitioner argues that the payment was essentially "damages" for a wrongful breach of the contract of employment by the company, though made by agreement of the parties; that if the cancellation agreement had not been entered into and the contract had been breached he would have been entitled to receive only such amount as he could show was the damage sustained in consequence of such

breach; that the amount of recovery would have been only sufficient to equalize the loss he would have sustained by reason of the breach and he would have been "neither ahead nor behind upon receiving the amount recovered"; that since no further services were required of him, it can not be said that he received income from services; and that by a parity of the reasoning contained in such cases as *C. A. Hawkins*, 6 B. T. A. 1023, and *Mrs. Lyde McDonald*, 9 B. T. A. 1340, which hold that no taxable income results from the receipt of "general damages for the personal injury suffered by reason of defamatory statements made", alienation of affections, breach of promise to marry and the like, the amount in question can not be considered as income.

We can not agree with this contention. The amount received by petitioner comes squarely within section 22 (a) of the Revenue Act of 1934, which provides:

SEC. 22. GROSS INCOME.

(a) GENERAL DEFINITION.—"Gross income" includes gains, profits, and income derived from salaries, wages, or compensation for personal service, of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *

Some of the language used by us in *Walter M. Hort*, 39 B. T. A. 922, 926 (on appeal, C. C. A., 2d Cir.), is apposite. In that case petitioner had received $140,000 for the cancellation of a lease on his property. We said:

This lease cost the petitioner nothing and we must assume, in accordance with the Commissioner's determination, that it had no basis in his hands for gain or loss. The payment of $140,000 which he received was income. *H. I. Josey, supra.* Cf. *Langwell Real Estate Corporation.* 47 Fed. (2d) 841, reversing 17 B. T. A. 196.

The final argument of the petitioner is that if the $140,000 was income, it was capital gain rather than ordinary income. Capital gain is defined in section 101 (c) (1) of the Revenue Act of 1932 as a gain from the sale or exchange of capital assets. A sale or exchange involves a transfer of property in goods. Williston on Sales (2d Ed.), vol. 1, ch. 1. Here the lease was extinguished, not sold or exchanged. The lessee did not acquire any valuable asset but merely obtained a release from his liabilities under the lease. The Supreme Court has held recently in *Fairbanks* v. *United States*, —— U. S. —— (3/27/39), that "payment and discharge of a bond is neither sale nor exchange within the normally accepted meaning of the words" and the gain derived from the redemption of bonds is not a capital gain. Likewise, it has been held that the settlement of a note for less than its face value is not a sale or exchange and does not give rise to a capital loss. *Hale* v. *Helvering*, 85 Fed. (2d) 819. Similar holdings have been made in regard to the voluntary surrender of a life insurance and annuity contract and in regard to liquidated damages for failure to perform a contract for the purchase of stock. *Frank J. Cobbs*, 39 B. T. A. 642; *George A.*

*Hellman*, 33 B. T. A. 901; *A. M. Johnson*, 32 B. T. A. 156. Cf. *James R. Stewart*, 39 B. T. A. 87. Neither business men nor lawyers refer to the cancellation or forfeiture of a lease for a consideration as a sale or exchange. The $140,000 received by the petitioner is not capital gain but is taxable to the petitioner as ordinary income. *H. I. Josey, supra*.

The translation by this petitioner of his contract right to receive compensation over a period of time into a single sum payable at once in cancellation of the contract, we think, resulted in the receipt by him of income. *Walter M. Hort, supra; H. I. Josey*, 38 B. T. A. 497; affd., 104 Fed. (2d) 453; *Thurlow E. McFall*, 34 B. T. A. 108. Cf. *Edward H. Clark*, 40 B. T. A. 333; *Lyeth v. Hoey*, 305 U. S. 188.

*Eisner v. Macomber, supra*, is cited by petitioner as supporting not only the contention presently being considered but also his second and third contentions. The three may therefore be considered together. Petitioner contends that under the rationale of the cited case the $150,000 "was not derived from capital or from labor and is not derived from both combined. Therefore, it is not income." He argues that the last few words of the portion of section 22 (a) set out, *supra*, must be construed not as taxing "income derived from any source whatever", as the statute states, but only as taxing "gains or profits" which are "income" from dealing in property. Therefore, he says, since he did not deal in property, he realized no income in the sense that the word is used in the statute.

No attempt will be made in this already too long opinion to discuss at length *Eisner v. Macomber, supra*. The language used by the Court in that case must be considered in the light of the facts then before it. The question was whether or not the recipient of a stock dividend had received income. In holding that she had not, the Court pointed out that nothing had been *derived—received* or *drawn* by the recipient for his (her) *separate* use, benefit and disposal. It was therefore held that no "income, from whatever source derived" (in the language of the Sixteenth Amendment) had been realized. But we do not construe the Court's opinion, as petitioner apparently urges that it should be construed, as limiting the words "income derived from any source whatever" to gains and profits derived from dealing in property. We think that they should be construed merely as a statutory enactment of the essence of the Sixteenth Amendment, i. e., as an attempt by Congress to include in taxable income, "income from whatever source derived." We hold, therefore, that the respondent properly included the amount in petitioner's income for the taxable year.

Petitioner's argument upon the fourth point is not persuasive. He neither "sold nor exchanged" a capital asset. Like the petitioner in *Thurlow E. McFall, supra*, he did not sell his contract, "for inherently

this [he] * * * could not do." His qualifications and skill formed the material ingredient in the contract and such a contract can not be sold. *Arkansas Valley Smelting Co.* v. *Belden Mining Co.*, 127 U. S. 379; *Estate of John D. Beals*, 31 B. T. A. 966; affd., 82 Fed. (2d) 268; *Sloan* v. *Williams*, 138 Ill. 43; 27 N. E. 531; *Salmon Lake Seed Co.* v. *Frontier Trust Co.*, 153 Atl. 671; *Walter M. Hort, supra; Richard S. Doyle*, 37 B. T. A. 323; affd., 102 Fed. (2d) 86. The respondent therefore did not err in determining that the amount received constituted ordinary income rather than a capital gain.

Petitioner's fifth contention, that he is entitled to deduct the amount which it would have cost him to purchase an annuity paying him $200 a month commencing at age 55, must be denied for lack of evidence. The evidence does not justify a finding that he gave up his right to receive a pension. It will be noted that the quoted section of the pension plan provides that "*Any* employee whose term of employment has been thirty years or more" may be retired from active service and be granted a pension. Petitioner, according to the certificate of the secretary of the fund, had formally been determined to be entitled to use the "date of June 1, 1903, from which to compute benefits to which * * * [he] would be entitled under the Plan", after being given "credit for his services prior to December 2, 1932 with said Theodore Gary and Company and other companies allied and associated with said Theodore Gary and Company, as is permitted under said Plan." He probably, therefore, had a vested right to receive a pension prior to October 1, 1934. The contract of that date is silent as to, and makes no mention whatever of, a pension. In addition, as we have mentioned above, even though the particular contract of employment was terminated, the record does not indicate whether he remained in the employ of the company in some other capacity or not. Inferentially he did; for he related in some detail the activities in which he engaged for and in behalf of the company during the year 1935. He also claimed and was allowed deductions from gross income in substantial amounts for entertaining business guests. We express no conclusion upon the issue of law which might have arisen if the necessary facts had been established by the evidence. We merely hold that the claimed off-set or deduction may not be allowed under the evidence before us.

The remaining question is: May dues paid to the Chicago Athletic Club in the amount of $162 be allowed as a deduction from gross income? Petitioner's contention is that the amount, under the facts, should be allowed as an ordinary and necessary business expense under section 23 (a) of the Revenue Act of 1934.

The evidence upon this issue, though somewhat extensive, merely shows that petitioner belonged to the club before, during, and after the taxable year and paid his dues at the rate of $13.50 per month. He testified that he never made any use of the swimming pool or athletic features of the club, but used it for the purpose of entertaining business guests; also "for some business contact, we would meet in there." "I use it [at the time of the hearing] about as I described it here before. I use it as a business contact." Petitioner testified that during the taxable year his work with the company was that of a "negotiator", negotiating telephone franchises, concessions, modifications in existing franchises and concessions, etc., with various countries, particularly South American countries. (This, it will be noted, was apparently after the termination of his employment contract.) That sometimes representatives of such countries came to Chicago and it was necessary for him to entertain them. The only specific instance given for the taxable year is as shown in the following excerpt from his testimony. "Well, I entertained them in my residence, I entertained them in a club such as this Chicago Athletic Club that was mentioned; I chiefly entertained them on a small motor boat I had, which was a rather unusual thing for every visitor here, and they all liked that sort of stuff. Seldom, if ever, would any of those people come to an office."

The evidence that the dues were both ordinary and necessary expenses of carrying on a trade or business is not convincing, especially when examined in conjunction with the evidence upon the other issues from which it appears that petitioner may even have ceased his activities as a negotiator prior to the taxable year. Cf. *Deputy v. duPont*, 308 U. S. 488. Entertainment expenses have frequently been allowed as deductions; *Cohan v. Commissioner*, 39 Fed. (2d) 540; *Joseph Kahn*, 38 B. T. A. 1417 (appeal pending, C. C. A., 2d Cir.), and cases cited; and the Commissioner has allowed this petitioner to deduct several thousand dollars obviously expended by him for such purposes. But substantial evidence has always been made a prerequisite for the allowance of club dues. Cf. *Louis Boehm*, 35 B. T. A. 1106; *N. H. Van Sicklen, Jr.*, 33 B. T. A. 544; *Reginald Denny*, 33 B. T. A. 738; *Hal E. Roach*, 20 B. T. A. 919; *Blackmer v. Commissioner*, 70 Fed. (2d) 255. Finding none such in the instant proceeding, we decline to disturb the respondent's disallowance of the claimed deduction.

The respondent committed no error in determining the deficiency in tax.

*Judgment will be entered for the respondent.*