John L. Ashe, Inc. v. Commissioner.
John L. Ashe, Inc. v. Commissioner
Docket No. 26496.
United States Tax Court
1952 Tax Ct. Memo LEXIS 308; 11 T.C.M. (CCH) 194; T.C.M. (RIA) 52056; February 29, 1952
R. B. Cannon, Esq., 909-913 Sinclair Bldg., Fort Worth, Tex., for the petitioner. Frost Walker, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: Respondent determined deficiencies in petitioner's income tax, declared value excess-profits tax, excess profits tax, and 50 per cent fraud penalties, as follows: Income Tax
Year
Deficiency
Fraud Penalty
1942
$ 300.51
$ 150.26
1946
50,580.18
25,290.09
Declared Value
Excess-Profits Tax
1942
$ 3,744.37
$ 1,872.18
1943
3,116.55
1,558.28
1944
1,525.30
762.65
1945
4,704.87
2,352.44
Excess Profits Tax
1942
$29,004.91
$14,502.46
1943
33,031.71
16,515.86
1944
43,091.44
21,545.72
1945
27,164.01
13,582.01
The questions presented for *309 decision are: Did the Commissioner, in his determination, err: (1) In the amounts disallowed by him as compensation paid by petitioner to its president, John L. Ashe, and its vice-president, Walter E. Ashe, for each of the years 1942, 1943, 1944, 1945 and 1946, and to its secretary-treasurer, Ernest G. Ashe, in 1946? (2) By inventory adjustments increasing petitioner's reported net taxable income for each of the years 1942, 1943, 1944 and 1946? (3) By disallowing certain deductions claimed by petitioner as business expenses in 1942, 1943, 1944, 1945 and 1946, and depreciation on an automobile in 1944 and 1945? (4) In his imposition of a 50 per cent fraud penalty under section 293 (b) of the Internal Revenue Code? Other minor adjustments were not contested by petitioner. Findings of Fact Petitioner is a Texas corporation, incorporated March 28, 1927, and is engaged in the retail mercantile business at Fort Worth. Its income tax returns for the years involved were filed with the collector of internal revenue for the second district of Texas. Petitioner's original capital of $25,000 was, on March 6, 1943, increased to $30,000, and on July 24, 1944, to *310 $66,000. When first organized it took over a business theretofore owned and operated since 1923 by John L. Ashe, who will hereafter be called "Ashe". From date of incorporation to 1936, Ashe owned 60 per cent of the stock, K. A. Thomas 20 per cent and R. R. Wilson 20 per cent. In 1936, Ashe's brother, Walter E. Ashe, in consideration for property he transferred to petitioner, received from the other three stockholders pro rata an aggregate of 30 shares of petitioner's total of 300 shares, which proportionate ownership thereafter continued. A voting trust agreement accorded equal voting strength to each stockholder. Prior to 1940, petitioner occupied rented quarters in an antiquated building, inadequate in size and poorly arranged, which seriously and adversely affected its business. Its landlord, in 1940, advised Ashe that if petitioner would sign a ten year lease with a minimum annual rent of $7,200, the old building would be torn down and replaced with a new and modern one with needed additional space, etc. Stockholders other than Ashe were discouraged about petitioner's business and were reluctant to accept the landlord's offer, whereupon Ashe went to Chicago where an arrangement *311 was made for petitioner to operate its shoe business as a leased department, and also visited eastern markets where a line of credit was secured with clothing manufacturers, and petitioner thereupon executed such rental contract [1] and a new building was erected and occupied about August, 1940. Ashe personally guaranteed the landlord that petitioner would make all payments under the lease. From 1942 to 1946, inclusive, Ashe was president and Walter E. Ashe was vice president of petitioner, and in 1946 Ernest G. Ashe was its secretary-treasurer. In July, 1940, petitioner fixed the salary of Ashe and Walter E. Ashe at $300 and $200 per month respectively, plus 12 1/2 per cent of petitioner's annual net sales in excess of $120,000, to be divided between them in such proportion as they might determine, and they were thereafter compensated on that basis; in *312 November, 1941, the basis of the percentage compensation was increased from $120,000 to $130,000. On December 29, 1945, petitioner authorized "forthright payment" of $10,000 to Ashe and the same amount to Walter E. Ashe out of petitioner's 1945 earnings, the minutes reciting same "as just and fair augmented compensation for the years 1940, 1941 and 1942", which additional compensation was paid. Said officers had theretofore rendered services for which they had not been fully compensated. In 1946, Ernest G. Ashe was employed by petitioner as secretary and office and merchandise manager, and was paid an annual salary of $12,000. The compensation petitioner paid its officers in the taxable years and for which it claimed deduction are [is] in column 1 below. In column 2 are the amounts disallowed as unreasonable by the Commissioner in his deficiency notice, and in column 3 are the amounts of deductions allowed by him. Officers' Compensation
Year
Name
Claimed
Disallowed
Allowed
1942
John G. Ashe
$ 4,425.00
$ 825.00
$ 3,600.00
1942
Walter E. Ashe
1,425.00
825.00
600.00
1943
John G. Ashe
17,457.88
12,457.88
5,000.00
1943
Walter E. Ashe
16,857.88
13,257.88
3,600.00
1944
John G. Ashe
23,280.36
18,280.36
5,000.00
1944
Walter E. Ashe
20,880.36
17,280.36
3,600.00
1945
John G. Ashe
56,176.58
41,176.58
15,000.00
1945
Walter E. Ashe
29,776.57
25,901.57
3,875.00
1946
John G. Ashe
55,263.51
40,263.51
15,000.00
1946
Walter E. Ashe
28,232.49
19,232.49
9,000.00
1946
Ernest G. Ashe
12,000.00
6,000.00
6,000.00
*313 Ashe devoted his entire time to petitioner's business, working long hours and sometimes on Sunday. He was, as one witness said, "the guiding spirit of the business", and was largely responsible for its success. The credit obtained by petitioer in the purchase of goods, and its ability to buy clothing when same was scarce was due to Ashe's recognized experience and ability as a clothing merchant. Walter Ashe was also popular with the trade and experienced in the clothing business and contributed materially to petitioner's success. From July, 1942, to July, 1945, while the United States was at war, Walter Ashe was absent in the military service, but at all times he intended to return to the service of petitioner, which he did in July, 1945, and has since been continuously employed by petitioner. Ernest G. Ashe rendered valuable service to petitioner in 1946. Reasonable compensation for petitioner's officers in the taxable years was as follows: Year
Name
Amount
1942
John G. Ashe
$ 4,425.00
1942
Walter E. Ashe
1,425.00
1943
John G. Ashe
$17,457.88
1943
Walter E. Ashe
11,500.00
1944
John G. Ashe
$23,280.36
1944
Walter E. Ashe
15,000.00
1945
John G. Ashe
$45,000.00
1945
Walter E. Ashe
27,500.00
1946
John G. Ashe
$45,000.00
1946
Walter E. Ashe
25,000.00
1946
Ernest G. Ashe
10,000.00
*314 Inventories Petitioner is known as a specialty store and handles high-priced men's clothing and furnishings, and also sells some ladies' apparel. In each of the taxable years petitioner took its annual inventory, and by the method it always employed, each and every article of merchandise in the store was systematically counted and entered on inventory sheets, and at the same time the retail selling price of each article was recorded. The merchandise was arbitrarily classified into three classes, good, fair and poor. The original cost was determined by subtracting the mark-up from the retail price. Petitioner then reduced the cost price by an arbitrary amount, using different factors for each of the classes, good, fair and poor, to obtain the reported inventory values. The reduction from cost accounts for "depreciation" resulting from damaged or inferior merchandise, poor quality, bad workmanship and for obsolete styles. The following table indicates the comparative retail price, cost price, the petitioner's reported closing inventory and the closing inventory as determined by respondent in the deficiency notice: Closing Inventory
Closing Inventory
Year
Retail Price
Cost
by Petitioner
by Respondent
1942
$132,437.25
$44,809.05
$79,462.35 [2]
1943
138,584.48
$ 82,613.99
35,678.90
82,613.99
1944
194,289.40
117,173.67
56,578.05
117,173.67
1945
116,399.70
69,839.28
41,986.24
72,808.93
1946
279,853.93
155,782.62
69,001.12
167,912.36
*315 The closing inventory for the year 1942 is $44,809.05, and the opening inventory for 1943, the first year adjusted, is $79,462.35. In 1943 the closing inventory was composed of some 15 general classifications of merchandise such as ties, hose, hats and shirts. Of the 15 general classifications, not one class of items was reported in the inventory at its full cost price. The reported inventory figure for each class of items was depreciated arbitrarily to approximately half of the cost price, as the result of the application of petitioner's depreciation factor to the cost price. In the 1945 closing inventory, 41 classes of merchandise were listed. Only six classes were reported at the inventory or the full cost price. Each of the other classes was depreciated by some arbitrary figure. The inventory figure ranged from zero to 100 per cent of the original cost price. In the 1946 closing inventory, 68 classes of merchandise were listed, but not one class was listed at the cost price. Each class was reduced by an arbitrary depreciation figure. Petitioner shows no history upon which the arbitrary depreciation *316 figures for damaged or inferior merchandise, bad workmanship or for obsolete styles can be determined. Each year the petitioner used a depreciation factor which was unrelated to any factor or figure of prior years. During the war years petitioner was forced to purchase some inferior merchandise. However, it was not necessary to hold reduced price sales during these years because petitioner's salesmen "could sell just about anything in the world" they could get. On the average, cost of petitioner's merchandise constituted 60 per cent of the retail selling price. Respondent determined the value of petitioner's closing inventories to be the amount established by petitioner as the retail price less mark-up, but without the additional arbitrary deduction. Claimed Business Deductions Petitioner, in its income tax returns, claimed business deductions in each of the taxable years variously designated as "entertainment and promotional", "travel and promotional", "club dues of its officers", etc., in the following aggregate amounts: for 1942, $188.10; for 1943, $898.93; for 1944 $2,263.82; for 1945, $763.54; for 1946, $1,316.65, all of which claimed deductions respondent disallowed in *317 his notice of deficiency, on the ground that the same constituted personal expenses and were not deductible. Petitioner in its income tax returns also claimed deductions for automobile expenses and depreciation, in 1945 of $514.09, and in 1946 of $712.48, which respondent in his notice of deficiency disallowed and determined same were not "allowable deductions". In the taxable years Ashe was a member of the Fort Worth Club, [3] which has living quarters and dining room, a bar where foods and drinks are served, also a barber shop, bathrooms, etc., available for its members, all of which Ashe frequently patronized, and all sums so expended by him there were paid by petitioner and are included in the deductions here claimed, but what portion of said expenditures, if any, covered club dues or membership fees of Ashe or other officers of petitioner does not appear. Ashe met many people at the club and on the golf links, and by reason of these contacts petitioner sold some merchandise, but the number of such customers or the amount of *318 such sales the record fails to disclose or to even approximate. Ashe did little, if any, entertaining of customers or prospective customers, and practically all sums expended by him at the club were for his personal needs. He relied upon "contacts" rather than "entertainment" as justifying the charging of such expenses to petitioner. A substantial part of the expenditures for which deduction is here sought were incurred by Ashe for rooms and food at two hotels in Fort Worth. In 1944 Ashe was separated from his wife and lived at these hotels for a part of that year. He wrote some of the advertisements for petitioner at his hotel room, and occasionally had business conferences at his hotel room, but all of such hotel expenditures were for Ashe's personal benefit. Petitioner had no delivery truck and ordinarily made no delivery of goods sold. On a few special occasions Ashe's personal automobile was used by petitioner, but the number or frequency of such trips, the mileage traveled or gas consumed is not shown, or not even approximated. In 1944 Ashe made a trip in his own automobile from Fort Worth to Fort Knox, Kentucky, to bid his brother Walter goodby before he went overseas, and *319 also allegedly to talk to him about some business affairs of petitioner in which they were both interested, and some $300 of the deductions here sought were automobile expenses of this trip. Petitioner was not guilty of fraud in the making and filing of its income tax returns for any of the taxable years involved. Opinion Issue 1: Section 23 (a) (1) (A) of the Internal Revenue Code authorizes a deduction of "a reasonable allowance for salaries or other compensation for personal services actually rendered". It has been uniformly held that what constitutes "reasonable allowance" is essentially one of fact to be determined by the peculiar facts and circumstances in each case. Petitioner and respondent differ widely as to what was reasonable compensation for the officers of petitioner in the taxable years, and much evidence was introduced on this issue, all of which has been carefully reviewed and considered by us. Based upon the record as a whole, we have found as an ultimate fact the amounts which we deem to have been reasonable compensation for each of petitioner's officers in each of the years involved. While such amounts do not in all respects coincide *320 with petitioner's contention, they do vary materially from those determined as reasonable by respondent, and his action is reversed and deductions will be allowed in conformity with our findings. Among other facts and circumstances which we think refute the adequacy of the compensation determined by respondent and which in turn sustain our holding on this issue are these: the nature, character and effectiveness of the services of the officers; the large volume of petitioner's business; that the major portion of Ashe's and Walter Ashe's compensation was based upon a contingent contract, being 12 1/2 per cent of the net sales in excess of $130,000; under the voting trust agreement the stockholders other than the officers determined the salary of the officers, thus making the compensation contract in the nature of an arms' length transaction. Compensation paid officers pursuant to contingent contract entered into in prior years, where reasonable, for services rendered is deductible. Cf. California Vegetable Concentrates, 10 T.C. 1158. Respondent cannot justify his disallowance of compensation paid Walter Ashe because some of the years he was absent in military service *321 in time of war. The facts here are substantially the same as in Berkshire Oil Co., 9 T.C. 903, where we permitted a taxpayer corporation, under similar circumstances, to deduct compensation paid one of its officers. Issue 2: Petitioner contends that the respondent erred in making inventory adjustments for the years 1942 through 1946. Respondent determined that petitioner's closing merchandise inventories for the years 1942 through 1946 were understated, and that such understated inventories, excepting the year 1945, resulted in an understatement of the petitioner's gross income from sales. Respondent therefore adjusted the closing inventories for these years and determined deficiencies on the basis of the adjustments. The adjustments resulted in an overstatement of the gross income from sales for the year 1945. Respondent has adjusted petitioner's 1942 closing inventory, but has not made a similar adjustment for the opening inventory for that same year. It appears from the record that petitioner used the same method for taking the opening inventory for 1942 as it did for compiling the closing inventory for that year. Therefore, if an adjustment was required for the *322 closing inventory, a similar adjustment should have been required for the opening inventory of that year. We think that the respondent erred when it adjusted the 1942 closing inventory without making a similar adjustment of the opening inventory for the same year. When either the opening or closing inventory of a taxable year is adjusted, without correspondingly adjusting the other inventory for the same year, a distortion of income results. Thomas Shoe Co., 1 B.T.A. 124. Cf. Carmichael Tile Co., 192 Fed. (2d) 209; affirming Tax Court Memorandum Opinion [9 TCM 351]. The deficiency based on the adjusted closing inventory adjustment for the year 1942 is erroneously determined; therefore this deficiency can not be sustained. However, with respect to the inventory adjustment for the other taxable years before us, the deficiency determination of the respondent must be sustained. In order to reflect net income correctly, an inventory at the beginning and at the end of each taxable year is necessary in every case in which the production, purchase or sale of merchandise is an income-producing factor. Cf. section 29.22 (c)-1, Regulation 111. Section *323 22 (c) of the Code and the regulations provide two tests to which each inventory must conform: (1) it must conform as nearly as may be to the best accounting practice in the trade or business, and (2) it must clearly reflect the income. Section 29.22 (c)-2 of Regulations 111 establishes the rule that consistency is to be given greater weight than any particular method of inventory so long as the method used is substantially in accord with the regulations. Petitioner has been consistent to a certain degree. In the years before us it has consistently used arbitrary factors to account for depreciation of its inventories merchandise. Even the use of arbitrary factors might be condoned, though not in conformity with the regulations, if the same depreciation factors had been used for successive years. It might be said that even this method could clearly reflect income. However, the evidence indicates that petitioner was not consistent in the use of depreciation factors when determining the value of its closing inventory. Petitioner defends the evaluation of its inventories by alleging that it reports inventory on the basis of a cost or market, whichever is less. Petitioner's conception *324 of market value was an amount based on cost less some arbitrary percentage for depreciation. This certainly does not meet the well established definition of market. The regulations expressly provide that market is "the current bid price prevailing at the date of the inventory for the particular merchandise in the volume in which usually purchased by the taxpayer". Section 29.22 (c)-4. In the brief, petitioner contends that the respondent's inventory adjustments are erroneous in that they do not provide for and give consideration to such things as broken lots, damaged or defective merchandise. This contention is without merit. Respondent has determined petitioner's closing inventory by subtracting the average mark-up from the total retail inventory. The average mark-up for petitioner's business does, because it is average, consider the losses and exigencies named above. Since no evidence was presented to prove an actual market price of petitioner's merchandise, respondent's determination as to value of closing inventory is sustained as to all years except 1942, and the value of the closing inventory for that year we hold to be $44,809.05. Cf. Lucas v. Kansas City Standard Steel Co., 281 U.S. 264; *325 Black & Yates, Inc., 2 B.T.A. 873. Issue 3: Petitioner wholly failed to meet its burden of proof as to all business and automobile deductions disallowed by the respondent. No proof was made of "club dues of its officers" having been paid by petitioner, and the evidence as to "automobile expenses and depreciation" was vague, indefinite and uncertain and not even sufficient to invoke the Cohan rule. Under Ashe's testimony, who was the only witness on this issue, the expenditures in question were all made by him, and apparently most, if not all, were for his own personal benefit. He could not recall anything spent for "entertainment" of others, but claimed that the "contacts" he had at the club, hotels, etc., when he was spending the money in question, resulted in new customers for petitioner, which may have been true. However, even claimed business deductions for club membership and entertainment must be sustained by substantial evidence. Cf. George K. Gann, 41 B.T.A. 388. The expenditures here were personal living expenses and are not deductible. The expense of the auto trip to Fort Knox cannot be classified as an ordinary and necessary business expense, *326 and hence is not deductible. Respondent's disallowance of the claimed deductions is sustained. Issue 4: Concerning the issue of fraud, respondent has failed to meet his burden of proof, and his imposition of a 50 per cent fraud penalty is reversed. Decision will be entered under Rule 50. Footnotes
1. TERMS OF LEASE - 10 YEAR DURATION: - Minimum monthly rent $600, or 6 per cent of first $120,000 annual net sales. Maximum monthly $1,000, or 6 per cent of first $200,000 net sales. Later (November, 1941) when small additional space added, increased to minimum of $650 per month, or 6 per cent of first $130,000 net sales.↩
2. Respondent did not adjust the opening inventory for the year 1942.↩
3. Other officers of petitioner are not shown to be members of the Club, and all expenditures at the Club appear to have been made by Ashe only.↩