Gerald B. O'Neill and Florence M. O'Neill v. Commissioner.
O'Neill v. Commissioner
Docket No. 94617.
United States Tax Court
T.C. Memo 1963-286; 1963 Tax Ct. Memo LEXIS 57; 22 T.C.M. (CCH) 1471; T.C.M. (RIA) 63286; October 22, 1963
Robert J. Casey, Thomas E. Tyre and John A. Craig, for the petitioners. Colin C. Macdonald, Jr. and Robert E. Shapiro, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined a deficiency in petitioners' income tax for 1956 in the amount of $33,657.73. The issues are (1) whether certain amounts received by petitioner in 1956 in connection with the purported transfer in that year of a contract held by him are taxable as ordinary income or as capital gains; (2) whether such amounts received by petitioner may be reported on the installment method; and (3) whether certain expenditures incurred and amounts payable by petitioner to a third party may be considered in determining the total amounts taxable to petitioner as a result of the purported contract transfer. *58 Findings of Fact Some of the facts were stipulated and they are so found. Gerald B. and Florence M. O'Neill, husband and wife, are residents of Larchmont, New York. They filed a joint Federal income tax return for 1956 with the district director of internal revenue, Lower Manhattan, New York, New York. Gerald O'Neill, who will hereinafter be called the petitioner, reports his income on a cash method of accounting. Petitioner is an attorney who has practiced in New York since 1929. From 1950 until the middle of 1955 petitioner represented Tri-Chem, Inc., hereinafter called Tri-Chem, a New Jersey corporation organized in 1950. Thorne E. Lloyd, Kathleen A. Lloyd and George W. Munns owned all of the stock of Tri-Chem and they constituted its board of directors. Thorne E. Lloyd was president and treasurer of Tri-Chem, Kathleen A. Lloyd was vice-president and secretary, and George W. Munns was vice-president. Tri-Chem manufactured a special paint compound packaged in a collapsible pharmaceutical-type tube fitted with a ballpoint dispenser and sold under the trademark and tradename of Tri-Chem Pen. Some time prior to April 1, 1954 petitioner was requested by the officers of Tri-Chem *59 to find a distributor for its product outside the United States. Petitioner, after considerable negotiations, managed to interest Airkem, Inc., a New York corporation, in undertaking distribution of the product outside the United States. Petitioner then discussed with Tri-Chem's president (Thorne E. Lloyd) his fee for services rendered in obtaining the distribution contract with Airkem, Inc. and petitioner advised Lloyd that he would accept either a fee based upon the services performed at the regular rate or a fee payable out of the proceeds of the distribution contract. Lloyd chose the latter alternative. On April 1, 1954 the petitioner and Tri-Chem entered into an agreement which stated that whereas (1) petitioner was successful in finding a company to distribute Tri-Chem's product outside the United States, (2) petitioner was presently negotiating a contract between Tri-Chem and Airkem, Inc., which contract was about to be executed, and (3) petitioner's services "were rendered on a contingent basis and it is the desire of the parties * * * to enter into an agreement with respect to the compensation to [petitioner] for said services", Tri-Chem agreed to "pay to [petitioner] *60 out of the payments received by it from Airkem, Inc. pursuant to the contract to be entered into between Tri-Chem, Inc. and Airkem, Inc. ten per cent. * * * of said payments until [petitioner] has received Ten Thousand Dollars * * * and ten per cent. * * * of such payments for a period of ten * * * years thereafter." On May 12, 1954 Tri-Chem and Airkem, Inc. entered into an agreement under which Airkem, Inc. was granted the exclusive right to manufacture, use and sell Tri-Chem's product (or products) outside the United States, and in consideration therefor Airkem, Inc. agreed to pay to Tri-Chem two and one-half cents, or the equivalent in foreign currency, for each fluid ounce of the product sold by Airkem, Inc. The agreement could be terminated by Airkem, Inc. at the end of any calendar year by giving 60 days notice, or at the election of Tri-Chem if Tri-Chem did not earn at least $30,000 in any calendar year after 1956, unless Airkem, Inc., within 90 days after notice to it, paid to Tri-Chem a sum equal to the amount by which its earnings were less than $30,000. The amounts ultimately due to Tri-Chem from Airkem, Inc. under the May 12, 1954 contract were $49.18 and $2,424.69 *61 for the years 1955 and 1956, respectively. Sometime prior to November 30, 1954 the stockholders of Tri-Chem requested petitioner to find a purchaser for Tri-Chem, and they indicated that they preferred a contingent fee arrangement for petitioner's services. On November 30, 1954 petitioner and Tri-Chem, together with Tri-Chem's stockholders, entered into an agreement under which it was agreed that petitioner would undertake to find a purchaser for either the stock or assets of Tri-Chem. Tri-Chem agreed to pay to petitioner "as compensation for legal services rendered and as commissions for procuring a purchaser, the amount by which the sale price of the assets of Tri-Chem, Inc., or the stock thereof, exceeds One Million Dollars * * *." Sometime during the first six months of 1955 petitioner obtained an offer from Airkem, Inc. for the acquisition of the stock or assets of Tri-Chem. In June or July of that year the president of Tri-Chem indicated to petitioner he might make a sale of the assets elsewhere and, subsequently, the Tri-Chem stockholders declined to accept the offer of Airkem, Inc. On November 28, 1955 the stockholders and directors of Tri-Chem formally resolved to sell *62 its physical assets, goodwill and inventory, exclusive of cash and bills receivable, to E-I Mutual Association. On December 5, 1955 Tri-Chem filed a Certificate of Dissolution with the Secretary of State for the State of New Jersey. On December 7, 1955 Tri-Chem delivered an assignment of its rights under the contract dated May 12, 1954, between Tri-Chem and Airkem, Inc., to E-I Mutual Association. As of December 7, 1955, E-I Mutual Association was not apprised of the contract between petitioner and Tri-Chem dated April 1, 1954. On January 3, 1956 petitioner wrote to Tri-Chem and to two of its stockholders (Thorne E. Lloyd and George W. Munns) stating that, in view of the sale of Tri-Chem's assets, he was inquiring as to what provisions had been made with repsect to his contract of April 1, 1954 with Tri-Chem under which he was to receive 10 percent of all payments received by Tri-Chem from Airkem, Inc. pursuant to its contract with Airkem, Inc. dated May 12, 1954. In similar letters addressed to Tri-Chem and to one of its stockholders under date of January 3, 1956, petitioner stated that "[on] or about June 1, 1955, Tri-Chem, Inc., through its duly authorized officers employed *63 me to find a purchaser of its corporate assets, on the best terms possible and without limitation as to time. Under the terms of that agreement I was to receive as 'legal fees, finders' fees and commission * * *' ten per cent * * * of all moneys, before taxes, received by Tri-Chem, Inc., as the purchase price." Petitioner further stated that he had located such a purchaser; that he had performed every term of the employment contract, and that he thereby made a demand for his fee. On January 27, 1956 petitioner discussed with representatives of Tri-Chem the settlement of petitioner's claim for compensation under the contract to find a purchaser for the assets of Tri-Chem. Arthur Polier, an associate in petitioner's law office, then undertook negotiations for petitioner under this claim, and it was finally agreed to settle this claim by the payment of $32,500 to petitioner. On February 28, 1956, in consideration of the payment to him of $32,500 by Tri-Chem on account of the contract of November 30, 1954, petitioner executed a release of any and all claims which he might have against Tri-Chem and its stockholders. The release specifically excepted from its terms the contract of April 1, 1954 between *64 petitioner and Tri-Chem relating to the percentage (10 percent) of all payments which Tri-Chem might receive from Airkem, Inc. under the May 12, 1954 contract between Tri-Chem and Airkem, Inc. Tri-Chem was also anxious to settle the contract dated April 1, 1954. In discussions about this with Tri-Chem's representative held sometime between February 14 and 20, petitioner expressed his unwillingness to settle this contract on any lump sum basis during 1956 because of the tax consequences to him and suggested that the Tri-Chem stockholders purchase the April 1, 1954 contract from petitioner on an installment contract basis. This suggestion was not acceptable to the Tri-Chem stockholders. Polier, representing petitioner, then continued negotiations with Tri-Chem, and when it developed that Tri-Chem would only consider a lump sum settlement, it was decided that Polier would "buy" the April 1, 1954 contract from petitioner on an installment contract basis. On February 24, 1956 petitioner, as "Seller" and Polier, as "Purchaser", executed an agreement which provided, inpart, as follows: WHEREAS, the Seller is the sole owner of a contract with TRI-CHEM, INC., a New Jersey corporation, *65 dated April 1, 1954, under which the Seller is entitled to royalties in the amount of ten per cent (10%) of all payments which said TRI-CHEM, INC., or its successors or assigns, might receive from AIRKEM, INC., a New York corporation, under a separate agreement in writing between said TRI-CHEM, INC. and said AIRKEM, INC. dated May 12, 1954, and WHEREAS, the Seller has offered to sell and the Purchaser has agreed to buy the said contract with TRI-CHEM, INC. dated April 1, 1954, on the terms hereinafter set forth: IT IS THEREFORE AGREED: 1. The Seller shall sell to the Purchaser and the Purchaser shall purchase from the Seller the contract of the Seller with TRI-CHEM, INC. dated April 1, 1954, and all rights of the Seller to royalty payments thereunder, for a total consideration of SEVENTY THOUSAND DOLLARS ($70,000) to be paid as follows: SEVEN THOUSAND DOLLARS ($7,000) in cash or by certified check payable to the order of the Seller, and SIXTY-THREE THOUSAND DOLLARS ($63,000) evidenced by a series of negotiable promissory notes. Each promissory note shall be signed by the Purchaser and shall be made payable to the order of the Seller at New York, New York, and each note shall *66 bear interest at the rate of four per cent (4%) per annum payable at maturity. The Purchaser shall have the privilege of prepaying any or all of the notes, without penalty, but upon his default in the payment of principal or interest on any note when due, all the notes in the series shall immediately become due and payable. The notes in this series shall be in the following amounts and shall be due on the following dates: Number
Amount
Date Due
1
$7,000
January 6, 1957
2
7,000
January 6, 1958
3
7,000
January 6, 1959
4
7,000
January 6, 1960
5
7,000
January 6, 1961
6
7,000
January 6, 1962
7
7,000
January 6, 1963
8
7,000
January 6, 1964
9
7,000
January 6, 1965
2. Upon receipt of the SEVEN THOUSAND DOLLARS ($7,000) in cash or by certified check, and the promissory notes, referred to in Paragraph 1 hereof, the Seller shall deliver to the purchaser, upon the closing date as hereinafter provided, a duly executed Assignment assigning all of the Seller's right, title and interest in and to the aforementioned contract with TRI-CHEM, INC. dated April 1, 1954, and any and all other papers which the Purchaser may reasonably require for the enforcement *67 and collection of said contract. On February 29, 1956 petitioner executed an "ASSIGNMENT" to Polier of petitioner's entire interest in the April 1, 1954 contract, and in the sums payable thereunder, and authorized Polier "to do everything necessary to collect the moneys payable under the said contract." On March 2, 1956 petitioner executed a release of all claims against Tri-Chem both for himself and for the law partnership. On March 5, 1956 Polier executed a release of all claims against Tri-Chem and received on that date $72,500 from Tri-Chem. Polier did not advise the representatives of Tri-Chem about the "ASSIGNMENT" of February 29, 1956 until after Tri-Chem had agreed to a settlement figure of $72,500. On March 2, 1956 Polier issued a check in the amount of $1,000 payable to petitioner, and on the same date Polier executed nine notes payable to petitioner, each in the amount of $7,000 and due on January 6, 1957 through 1965. On March 6, 1956 Polier issued a check payable to petitioner in the amount of $6,000 and on the same date issued another check payable to petitioner in the amount of $7,000. On March 7, 1956 Polier issued a check in the amount of $30,000 payable to *68 petitioner. On the same date petitioner executed a note payable to Polier in the amount of $30,000, with interest due at 4 percent per annum, and due on January 10, 1958. The note recites that payments were made as follows: Dec. 30, 1957
$7,500
Jan. 15, 1958
8,000
Jan. 6, 1959
7,700
Dec. 31, 1959
6,800
On January 7, 1957 there were eight of Polier's notes to petitioner still outstanding. Subsequently, Polier issued checks to petitioner in the following amounts: Date
Amount
Note No.
Jan. 7, 1957
$7,233.25
2
Jan. 6, 1958
513.33
3
Jan. 7, 1958
7,000.00
Jan. 16, 1958
7,521.10
8
Jan. 6, 1959
7,793.33
4
Dec. 31, 1959
7,500.00
5
Polier's notes to petitioner show they were cancelled on the following dates: Note No.
Date
1
Mar. 6, 1956
2
Jan. 7, 1957
3
Jan. 6, 1958
4
Jan. 6, 1959
5
Dec. 31, 1959
6
Dec. 31, 1959
7
Jan. 6, 1959
8
Jan. 16, 1958
9
Dec. 30, 1957
Three of the notes which Polier gave to petitioner (Nos. 6, 7 and 9) were regarded by the parties as paid in part by the cancellation by Polier of portions of the principal amount due on petitioner's note for $30,000 payable to Polier. These *69 cancellations were as follows: Portion of Petitioner's
Note No.
Date
Note Cancelled
9
Dec. 30, 1957
$7,500
7
Jan. 6, 1959
7,700
6
Dec. 31, 1959
6,800
Petitioner issued a check dated January 15, 1958 and payable to Polier in the amount of $8,000. On January 6, 1960 petitioner issued a check payable to Polier in the amount of $1,618.30. Petitioner reported on his 1956 return the amount of $11,466.67 as the "[receipt] on installment sale of rights under Tri-Chem Contract of April 1, 1954 (election under 453 I.R.C.)". Respondent increased petitioner's income for 1956 by the amount of $58,500, with the following explanation in the statutory notice of deficiency: (a) It has been determined that during the year 1956 you actually and/or constructively received payments exceeding 30% of the selling price realized on the sale of rights inuring to you under a contract dated April 1, 1954 with Tri-Chem, Inc. Accordingly, your treatment of this transaction as a casual sale of personalty coming within the purview of section 453 of the Internal Revenue Code of 1954 is disallowed, and your income is increased *70 in the amount of $58,500.00 as shown hereunder: Total selling price realized on
sale of rights arising from
April 1, 1954 contract with
Tri-Chem, Inc.
$72,500.00
Less: Payment to William H.
Chadbourne
2,533.33
Net Profit realized on sale
$69,966.67
Less: Reported on return
11,466.67
Additional income
$58,500.00
Opinion Petitioner's contract of April 1, 1954 with his client, Tri-Chem, was nothing more than an arrangement to compensate petitioner, a lawyer, for his services in finding a foreign distributor for the client's product. It is of no significance that the compensation for petitioner's services was geared to a percentage of the payments made by the foreign distributor to the client. See F. W. Jessop, 16 T.C. 491. Such a percentage arrangement certainly did not give petitioner any interest in the client's product, and the suggestion that petitioner makes on brief that he, by virtue of such a compensation contract, "acquired * * * an interest in the nature of a joint venture between himself and Tri-Chem" is completely without merit. We can assume, for purposes of this opinion, the validity of the assignment. But it was the assignment *71 of a contract for the payment for services he had performed. An amount received in cancellation of an employment contract or a contract for compensation is ordinary income in the year received. Victor H. Heyn, 39 T.C. 719; F. W. Jessop, supra; George K. Gann, 41 B.T.A. 388. Clearly, if petitioner had received a lump sum settlement from Tri-Chem of his compensation contract in 1956 it would be taxable to him in that year as ordinary income. Petitioner cannot, through the device of selling his contract, transmute ordinary income into capital gain. In essence, petitioner did nothing more than to assign to Polier his right to payment for compensation. "A taxpayer cannot convert what would come to him as ordinary income into capital gain by a sale in which the consideration is essentially a substitute for the amount he would otherwise receive as ordinary income." Donald B. Jones, 40 T.C. 249, 259. In Floyd L. Turner, 38 T.C. 304, this *72 Court indicated that "[whether] it be salary or commissions due the assignor, he realizes ordinary income when he assigns his right to payment." Petitioner argues that where a taxpayer sells a right to receive income which has not accrued or which cannot be ascertained with accuracy, then the gain realized from such sale is a capital gain. We cannot agree. In Commissioner v. P. G. Lake, Inc., 356 U.S. 260, where it was held that the proceeds from the assignment of certain future oil payments were taxable as ordinary income rather than capital gain, the Supreme Court recognized that the "lump sum consideration seems essentially a substitute for what would otherwise be received at a future time as ordinary income." Moreover, petitioner's right to compensation income under the April 1, 1954 contract certainly had accrued by 1956. Petitioner had performed his duties under the contract and all that remained was to press his claim for compensation, which he did early in 1956. The fact that the amount that would be due under the contract could not be ascertained with reasonable accuracy is of no importance here where anything paid pursuant to the contract would be ordinary *73 income. Petitioner received cash and nine negotiable promissory notes in 1956 totaling $70,000. There is no evidence in the record to show that the fair market value of these notes in 1956 was other than their face value. At any rate, petitioner has the burden on this point and he has made no effort to meet such burden. Charles E. Sorensen, 22 T.C. 321; Harry Leland Barnsley, 31 T.C. 1260. We hold that the gain realized by petitioner on the sale of his interest for $70,000 in the April 1, 1954 contract, with adjustments noted below, is taxable as ordinary income. A more troublesome question is presented by the second issue. Petitioner argues that in computing the gain realized on the sale of the contract he is entitled to deduct certain miscellaneous expenses and the amount payable to William M. Cahdbourne out of the proceeds. Chadbourne was petitioner's law partner, and petitioner contends that he had an "arrangement" with him that 25 percent of any amount received from the sale of the April 1, 1954 contract would go into the law firm, and that two-thirds of the 25 percent share would go to Chadbourne and one-third to petitioner. Respondent in his *74 statutory notice of deficiency allowed petitioner a deduction of $2,533.33 for a payment made to Chadbourne in 1956. This is slightly more than two-thirds of 25 percent of the $14,000 petitioner was reporting but its allowance is some recognition by respondent that the agreement to pay Chadbourne existed substantially as stated by petitioner. Petitioner in his pleadings and on brief claims that he is entitled to deduct $11,666.67 in 1956 from the proceeds of the contract sale if it be held that the entire $70,000 is taxable income to him in that year. This amount represents two-thirds of 25 percent, or one-sixth of $70,000. We are satisfied from the petitioner's testimony and other evidence in the record that such an understanding did, in fact, exist between petitioner and his law partner. The law firm's cash book for March 1956 indicates that Chadbourne did share in the proceeds of the petitioner's contract with Tri-Chem, and although we find it difficult to relate the figures in the cash book with the percentage split (i.e., two-thirds of 25 percent going to Chadbourne) to which petitioner testified, we feel that his testimony should be accepted. We hold that the proceeds from the *75 sale of the April 1, 1954 contract to be included in petitioner's income in 1956 should be adjusted for the precentage share payable to Chadbourne out of such proceeds. Decision will be entered under Rule 50.