NELSON WEAVER REALTY COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

NELSON WEAVER MORTGAGE COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 79957, 80631. Filed March 16, 1961.

*E. Grant Fitts, Esq.*, and *Alfred M. Naff, Esq.*, for the petitioners. *Wallace M. Wright, Esq.*, for the respondent.

PIERCE, *Judge:* Respondent, in Docket No. 80361, determined a deficiency in the income tax of petitioner Nelson Weaver Mortgage

Company, Inc., for its fiscal year ended September 30, 1955, in the amount of $54,192.89. Also, in Docket No. 79957, respondent determined a deficiency in the income tax of petitioner Nelson Weaver Realty Company, for its taxable calendar year 1955, in the amount of $3,666.02.

The cases were consolidated for trial.

The issues for decision are:

(1) Whether the sum of $121,841.11 which petitioner Nelson Weaver Mortgage Company, Inc., received from another mortgage corporation, in a transaction whereby it assigned to the latter corporation its contract with a life insurance company to service mortgage loans held by said insurance company, constituted long-term capital gain; or whether the same constituted ordinary income.

(2) Whether the sum of $8,000 which petitioner Nelson Weaver Realty Company received from a partnership, in a transaction whereby it transferred to said partnership "any rights" which petitioner might have to write hazard insurance on properties covered by the above-mentioned life insurance company's loans, constituted long-term capital gain, or whether the same constituted ordinary income.

### FINDINGS OF FACT.

### General Facts.

Some of the facts have been stipulated. The stipulation of facts, together with the exhibits identified therein and attached thereto, is incorporated herein by reference.

Petitioner Nelson Weaver Mortgage Company, Inc. (hereinafter called the Mortgage Company), is an Alabama corporation which has its principal office in Birmingham. Petitioner Nelson Weaver Realty Company (hereinafter called the Realty Company) also is an Alabama corporation which has its principal office in the same city. Each of these corporations filed its income tax return for its taxable year here involved, with the district director of internal revenue at Birmingham.

The president and majority stockholder of each of said corporations, at all times here material, was an individual named Nelson Weaver.

### Facts re Transaction Between Mortgage Company and Cobbs, Allen & Hall Mortgage Company, Inc.

Mortgage Company was incorporated in 1946, under the name of Hodo-Weaver Mortgage Company, Inc., with Mark Hodo and Nelson Weaver as its principal stockholders. In March 1953, Nelson Weaver purchased Hodo's interest in said corporation, and changed the name thereof to Nelson Weaver Mortgage Company, Inc.

At all times from Mortgage Company's organization until the time of the trial herein, its principal business was: (1) The making of loans on improved real estate, evidenced by promissory notes secured by mortgages; (2) the selling of such notes and mortgages to institutional "investors," such as insurance companies and banks; and (3) the subsequent "servicing" of mortgages on behalf of purchasers thereof. Also, at all times material, Mortgage Company handled the rental of real estate, both for itself and for clients; and in addition, it held certain real estate for its own investment purposes. Only its above-mentioned activities involving mortgages are directly involved in the instant case.

Mortgage Company's activities in relation to mortgages may be summarily described as follows. An individual desiring to buy or build a house, would make application to the Mortgage Company for a loan of funds to be used for such purpose. The Mortgage Company would then proceed to process the loan application; and in the course thereof, it would among other things confirm the applicant's bank balance, check his credit rating, and procure a report from his employer regarding his employment record and his prospects for continued employment. Thereafter, it would obtain commitments from agencies such as the Federal Housing Administration and/or the Veterans' Administration, to insure the applicant's loan. If Mortgage Company was then satisfied that the applicant was qualified, it would make the loan; and in the closing transaction, it would obtain a promissory note from the applicant, secured by a mortgage on his property. The Mortgage Company would thereupon have the mortgage recorded in the county where the property was situated.

Mortgage Company did not have sufficient capital to carry to maturity, all loans which it so made. Accordingly, it made contractual arrangements with several insurance companies, under which it would offer for sale to one of these companies, the notes and mortgages which it had taken in transactions of the type above mentioned. If one of such insurance companies purchased a note and mortgage (hereinafter, for convenience, referred to simply as the "purchase of a loan"), such insurance company would remit to Mortgage Company the amount which it agreed to pay for the same. Mortgage Company would thereupon execute assignment of the note and mortgage to the purchaser; and these assignments would then be recorded on the public records of the county wherein the property was situated. At this same time, the insurance company purchaser would pay to Mortgage Company a brokerage fee, in an amount from 1 to 1½ percent of the amount of the loan purchased.

Also, under Mortgage Company's above-mentioned contractual arrangements with the several insurance companies, it agreed to service the mortgages which it thus sold; and for such servicing work, it

received service fees from the insurance company-purchaser, based on a percentage of the outstanding balance on each loan. The servicing activities so performed by Mortgage Company consisted principally of receiving the monthly payments from the mortgagors, and of remitting the same to the insurance company after deducting its service fees and also amounts to cover taxes and insurance on the particular properties involved.

One of the insurance companies with which Mortgage Company had such a contractual arrangement, was the New York Life Insurance Company (hereinafter referred to as New York Life). New York Life had first entered into such an arrangement with Mortgage Company in 1947, when it was operating under the name of Hodo-Weaver Mortgage Company, Inc. In May 1953, after Nelson Weaver had purchased Hodo's interest in the corporation and changed its name (all as hereinabove found), a new contract was entered into by and between Mortgage Company and New York Life, which provided so far as here material, as follows:

WHEREAS the Correspondent [i.e., Mortgage Company] desires as vendor to submit to the Company [i.e., New York Life] for purchase notes or bonds (hereinafter referred to as loans) secured by first mortgages, deeds of trust or security deeds on property within the Cities of Birmingham [and certain other named cities in Alabama], * * * and the Company is willing to consider such loans with a view to purchasing same; and

WHEREAS the Company desires the Correspondent to act, and the Correspondent is willing to act in the said territory as the Company's servicing agent for the collection and remittance of principal, interest and other payments as they become due on such loans as may be so purchased by the Company * * * upon the terms and conditions hereinafter set forth.

Now THEREFORE * * * it is hereby mutually agreed as follows:

1. The Correspondent shall submit such loans for sale to the Company.

2. All loans offered to the Company shall be on forms and in terms acceptable to the Company * * *.

3. Until the purchase of the loan is approved and payment therefor made by the Company the determination as to whether the loan, the borrower or the title to the real estate is satisfactory shall be absolutely within the discretion of the Company.

*  *  *  *  *  *  *

6. Upon the approval and acceptance of the loan, the Company shall send remittance to the Correspondent * * *.

7. The Correspondent shall service for the Company all loans so purchased from it by the Company * * *.

8. As such servicing agent the Correspondent shall (1) attend to the collection of all principal, interest and other required payments when and as they become due and promptly remit the same to the Company; (2) use its best endeavors to see that fire and other hazard insurance is furnished in accordance with the provisions of said mortgages, * * * and forward all policies evidencing such insurance to the Company; (3) use its best endeavors to have all taxes and assessments levied upon the said premises duly paid in accordance with the provisions of said mortgages * * * and examine, at periodical intervals as requested by the Company, all necessary tax books to ascertain whether or not

such taxes and assessments have been paid, and render a report thereon to the Company; (4) promptly report to the Company all fire or other insurable losses and all damage or destruction to the said premises; (5) fulfill such other obligations customarily performed by servicing agents as may be requested by the Company.

\*      \*      \*      \*      \*      \*      \*

12. This Agreement may be terminated in its entirety at any time by the Company on five days' written notice and by the Correspondent on thirty days' written notice. Upon such termination the Correspondent shall be entitled to no compensation as to collections thereafter made. \* \* \*

13. The Company shall have the right at any time to audit the books, records and accounts of the Correspondent relating to the servicing of the said loans \* \* \*. Upon termination of this Agreement the Correspondent shall, upon request of the Company, immediately turn over to it, without charge, all papers and documents relating to said loans, \* \* \* and transcripts from the books, records and accounts of the Correspondent relating thereto.

13(a). The correspondent shall submit to the New York Life Insurance Company monthly, a statement of financial condition and a detailed statement showing profit and loss results for the month. \* \* \* At the end of each fiscal accounting year, annual financial statements, \* \* \* shall also be submitted.

\*      \*      \*      \*      \*      \*      \*

15. Neither this Agreement nor the rights, privileges or obligations thereunder shall be assignable by the Correspondent.

16. This Agreement cannot be modified except by an agreement in writing signed by the parties hereto.

All papers and documents relating to the New York Life loans, which Mortgage Company employed in connection with its servicing of such loans, were the property of New York Life and not of Mortgage Company.

New York Life had, in addition to Mortgage Company, at least one other correspondent in Birmingham from whom it purchased loans—the Cobbs, Allen & Hall Mortgage Company, Inc. (hereinafter called the Cobbs-Allen corporation).

For approximately 1 year prior to January 29, 1955, Mortgage Company did not sell any loans to New York Life. However, during its fiscal year ended September 30, 1953, it received approximately $66,500 in service fees from New York Life, computed in an amount equal to ½ of 1 percent of the remaining balances due on such loans: [1] and in its succeeding fiscal year ended September 30, 1954, it received such service fees in an approximate amount of $63,500. This reduction in service-fee income for the latter year was due to the fact that the outstanding balances of the mortgagors' loans (on the basis of which the service fees were computed) were decreasing.

On January 29, 1955, Mortgage Company entered into a Memorandum of Agreement with the above-mentioned Cobbs-Allen corporation, which provided so far as here material, as follows:

---

[1] Said rate did not apply to so-called "section 608 loans," as to which lower rates were applicable.

Subject to the approval of New York Life Insurance Company, Nelson Weaver Mortgage Company, Inc. hereby agrees to sell and Cobbs, Allen & Hall Mortgage Company, Inc. agrees to purchase all of the rights, title, obligations, and benefits pertaining to the servicing contracts of all of the mortgages now being serviced by the Birmingham Office of Nelson Weaver Mortgage Company, Inc. for the New York Life Insurance Company on the following terms and conditions:

It is agreed that the amount and types of the mortgages and the servicing fees now being received therefore shall be substantially in accord with the attached list which, for the purpose of identification, is made a part of this agreement. At the time of actual delivery to the Buyer of the complete files, ledger cards and all papers held by us pertaining to these mortgages, a current tabulation of the balances then due shall be made and if found to be substantially as the attached list indicates, the purchase price shall be $121,841.11, payable as follows:

$35,241.11 in cash, and by the execution of two notes from Cobbs, Allen & Hall Mortgage Company, Inc. to Nelson Weaver Mortgage Company, Inc. The first note shall be in the amount of $43,300.00 and shall be payable on November 1, 1955. The second note shall be in the amount of $43,300.00 and shall be due and payable on November 1, 1956. Each of the above notes shall bear interest from date at the rate of 3%.

Nelson Weaver, as President of the Nelson Weaver Mortgage Company, Inc. agrees that he will immediately advise the proper officials of the New York Life Insurance Company of our intentions under this contract and shall diligently make every effort to secure their approval thereof.

The schedule attached to the above Memorandum of Agreement showed that there were 1,589 loans to individuals (of which 225 were covered by both first and second mortgages) on which the remaining balances due totaled $10,764,071; and that there also were 12 section 608 loans on large apartment projects, on which the remaining balances totaled $4,165,446.

The average age of the New York Life loans which Mortgage Company was servicing on January 29, 1955, was 6½ years. Mortgage Company's experience indicated that said loans would be fully paid by the mortgagors between the 8th and 10th years of the lives of the loans.

Pursuant to the above agreement between Mortgage Company and Cobbs-Allen corporation, Nelson Weaver sought and obtained New York Life's approval of said agreement. Mortgage Company then transferred to Cobbs-Allen corporation the file for each of the loans covered by the agreement, and also two filing cabinets wherein such files were kept. Mortgage Company thereafter dispensed with the services of one of its employees who had been doing collection work on delinquent mortgage loan accounts; but otherwise, it made no change in its personnel or its operations, as the result of the transaction with Cobbs-Allen corporation. Following said transaction, Mortgage Company continued, without interruption, its business of procuring mortgage loans, and of selling the same to other insurance companies. It transacted no business with New York Life after January 29, 1955.

Mortgage Company's contacts with the various mortgagors who dealt with it, gave this company opportunities to have other business transactions either with said mortgagors, or with members of their families, or with their acquaintances—such as the selling of homes, the renting of apartments, or the making of new mortgages.

Mortgage Company, at all times material, kept its books and reported its income in accordance with an accrual method of accounting.

Cobbs-Allen corporation paid Mortgage Company the $121,841.11 mentioned in the above-quoted contract of January 29, 1955, in three installments of $35,241.11, $43,300, and $43,300, in Mortgage Company's fiscal years ended September 30, 1955, 1956, and 1957, respectively. Mortgage Company, on its books and in its returns treated the transaction in which it received said amount of $121,841.11 as an installment sale of a capital asset; and it reported the entire amount of each installment thereof as long-term capital gain computed without any basis.

Respondent, in his statutory notice of deficiency herein, determined that the above-mentioned amount of $121,841.11 constituted "the lump sum receipt of future income taxable as ordinary income," which was includible in Mortgage Company's income for its fiscal year ended September 30, 1955, as ordinary income.

*Facts* re *Transaction Between Realty Company and Cobbs, Allen & Hall Partnership.*

One of the principal activities of Realty Company was that of serving as an agent for certain indemnity insurance companies, in selling policies of insurance against loss from fire and windstorm; and also of selling policies of liability insurance for automobile owners. In addition, Realty Company bought, sold, and rented real estate. The instant case is concerned solely with the insurance-selling phase of said business.

Realty Company and the above-mentioned Mortgage Company were located in the same building in Birmingham, where they together shared one large room. The desks of their respective employees were arranged side by side. As hereinbefore found, the president and majority stockholder of each of said companies was Nelson Weaver.

Much of Realty Company's insurance business came from mortgagors who had dealings with Mortgage Company. Such mortgagors were required by the terms of their mortgages, to keep adequate fire and windstorm insurance in force on their properties. There was no requirement that they procure such insurance through Realty Company; but approximately 70 percent of the mortgagors whose loans had been purchased by New York Life, did procure their fire and windstorm insurance through Realty Company. These mortgagors, in

some instances, also procured their automobile liability insurance through Realty Company.

On January 29, 1955, Realty Company entered into a Memorandum of Agreement with Cobbs, Allen & Hall, a *partnership* [2] (hereinafter called the Cobbs-Allen partnership), which provided so far as is here material, as follows:

In connection with that certain agreement dated January 29, 1955 between Nelson Weaver Mortgage Company, Inc. and Cobbs, Allen & Hall Mortgage Company, Inc. regarding the sale of certain mortgage servicing contracts, it is hereby agreed between the two parties hereto that any rights we have to write certain Hazard Insurance in connection with the loans on which the servicing contract is to be sold, will be transferred and sold by Nelson Weaver Realty Company, Inc. to Cobbs, Allen & Hall, a partnership, under the following terms and conditions:

On all of the mortgages to be transferred and sold under the other contract mentioned herein, wherein Nelson Weaver Realty Company is currently writing the hazard insurance, it is hereby agreed that such policies will not be molested by Cobbs, Allen & Hall, a partnership, until their normal expiration and at the time of such normal expiration, it is agreed that Nelson Weaver Realty Company will not solicit, nor will it write, the renewal insurance on these policies, unless the firm of Cobbs, Allen & Hall, a partnership, specifically requests us to do so. * * *

At the time of the transfer of the mortgage servicing contracts, the insurance policies which are now written by Nelson Weaver Realty Company, Inc., except those above specifically deleted, shall be audited and agreed upon between the proper officials of the Insurance Departments of each company and Nelson Weaver Realty Company, Inc. agrees to sell and Cobbs, Allen & Hall, a partnership, agrees to purchase said accounts for $8,000.00.

There is no evidence that Realty Company sold or otherwise transferred to Cobbs-Allen partnership, any records or files relating to any policies of insurance which said Realty Company had theretofore written.

During the year 1955, Cobbs-Allen partnership paid Realty Company the $8,000 mentioned in the above-mentioned agreement. Realty Company, on its books of account, treated the transaction in which it received said sum, as the sale of a capital asset; and it reported the entire amount of said $8,000 on its return for the calendar year 1955 as long-term capital gain computed without any basis.

Respondent, in his notice of deficiency herein, determined that said amount of $8,000 constituted "ordinary income from a covenant not to compete rather than the proceeds from the sale of a capital asset."

### OPINION.

### *I.*

Under the first issue, it is necessary to determine the character of the $121,841.11 which Mortgage Company received from Cobbs-Allen

---

[2] Not to be confused with the above-mentioned *corporation*, Cobbs, Allen & Hall Mortgage Company, Inc.

corporation, in connection with the transaction between these two companies which is described in our Findings of Fact. Petitioner Mortgage Company contends that said amount constitutes proceeds from the sale of a capital asset, entitled to the preferential tax treatment accorded capital gains by section 1201 of the 1954 Code. Respondent, on the other hand, determined that the above-mentioned amount is ordinary income and taxable in full.

We start with the proposition that, in order to prevail, petitioner must establish that it has sold or exchanged a *capital asset* which it has held for more than 6 months. Section 1222 (4) of the 1954 Code. We must also bear in mind that the Supreme Court has recently laid down, on three different occasions, the rule that the term "capital assets" is to be construed narrowly. *Commissioner* v. *Gillette Motor Transport, Inc.*, 364 U.S. 130; *P. G. Lake, Inc.* v. *Commissioner*, 356 U.S. 260; and *Corn Products Refining Co.* v. *Commissioner*, 350 U.S. 46. The Court stated, in the *Corn Products* case, as follows (350 U.S. at 52):

> The preferential treatment provided by § 117 applies to transactions in property which are not the normal source of business income. It was intended "to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions." Burnet v. Harmel, 287 U.S., at page 106, 53 S. Ct. at page 75. Since this section is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly. This is necessary to effectuate the basic congressional purpose. This Court has always construed narrowly the term "capital assets" in § 117. * * *

In the instant case, we search in vain for any capital asset which petitioner sold to Cobbs-Allen corporation. As regards the loan files which were transferred to said corporation, the contract which petitioner had with New York Life makes it clear that these files could not have been the subject of a sale; for as indicated in paragraph 13 of said contract, and as we have hereinbefore found, said files were the property of New York Life, and not Mortgage Company. Also, from Cobbs-Allen corporation's standpoint, it did not acquire any right from Mortgage Company either to sell loans to, or to service loans for, New York Life; for Cobbs-Allen corporation already had its own mortgage brokerage and loan-servicing contract with New York Life.

In our opinion, what Mortgage Company really sold to Cobbs-Allen corporation was the contingent right to earn future compensation from New York Life, as a servicing agent. It is to be noted that under those provisions of Mortgage Company's contract with New York Life which related to servicing mortgage loans, Mortgage Company was required to perform as an agent, certain specified services with respect to the mortgage loans that New York Life had purchased;

and for the performance of such services, it was to be paid compensation, i.e., service fees. In essence, Mortgage Company's contract with New York Life amounted to nothing more than a contract to perform personal services. And when Mortgage Company undertook to sell its "rights, title, obligations and benefits pertaining" to said contract, the only thing of value which it could transfer to Cobbs-Allen corporation was the contingent right to earn compensation, in futuro, for the performance of personal services, i.e., servicing the mortgage loans.

Both Mortgage Company and Cobbs-Allen corporation seem to have had the view that this contingent right to earn future compensation was the subject matter of the transaction; for the second paragraph of their Memorandum of Agreement indicates that the amount to be paid by the latter company was fixed solely with reference to the number and dollar-amounts of the loans which Mortgage Company was then servicing for New York Life. The contingent compensation (service fees) to be earned was, of course, geared directly to the dollar-amounts of the loans. Said second paragraph provided:

It is agreed that the amount and types of the mortgages and the servicing fees now being received therefor shall be substantially in accord with the attached list which, for the purpose of identification, is made a part of this agreement. At the time of actual delivery to the Buyer of the complete files, ledger cards and all papers held by us pertaining to these mortgages, a current tabulation of the balances then due shall be made and if found to be substantially as the attached list indicates, the purchase price shall be $121,841.11, payable as follows: * * * [three annual installments specified].

Moreover, an examination of the actual dollar-and-cents amounts of the service fees which Mortgage Company could have anticipated receiving in respect of the New York Life loans, is persuasive that the $121,841.11 here involved was simply the present value of the right to earn such anticipated income. Our findings show that the average age of the New York Life loans being serviced by Mortgage Company was 6½ years; and that Mortgage Company's experience was that said loans were usually paid before maturity, at some time between the 8th and 10th years of the lives of the loans. Thus, the average life expectancy of such loans at the time of the transaction here involved, was between 2 and 3 years—for convenience let us say 2½ years. If the rate of decline (4½ percent) in service-fee income which prevailed between the years 1953 and 1954 (i.e., from $66,500 to $63,500) is projected over the 2½ years immediately following January 29, 1955, the service-fee income could have been expected to be, during the remaining lives of the loans: $40,428 for the 8 months until September 30, 1955; $57,913 for the fiscal year ending September 30, 1956; and $46,090 for the remaining 10-month period ending July 31, 1957—or a total of $144,431. Mortgage Company actually received from Cobbs-Allen corporation, the amount of

$121,841.11—so that its anticipated future income from servicing New York Life loans was disposed of at a discount of $22,589.89. The economic burden of this discount was minimized by the fact that the deferred portion of the price to be paid by Cobbs-Allen corporation was represented by two notes of $43,300 each, which bore interest at the rate of 3 percent per annum.

This Court has held that amounts received by a taxpayer from an alleged purchaser of the taxpayer's contracts to perform personal services for a third party, were not capital gains. *General Artists Corporation*, 17 T.C. 1517, affd. 205 F. 2d 360 (C.A. 2); *Thurlow E. McFall*, 34 B.T.A. 108. See also *George K. Gann*, 41 B.T.A. 388. In the *McFall* case, the taxpayers had contracts to perform the services of a superintendent and a metallurgist, respectively, for a foundry company. After performing under the contract for somewhat over 2 years, the taxpayers purported to sell their contracts to a third party for $175,000; and thereafter the taxpayers reported said amount as capital gain on their income tax returns. We held that they were not entitled to capital gains treatment, and stated in part as follows (34 B.T.A. at 110):

Petitioners did not sell their contracts, for inherently this they could not do. The contracts bound them to perform services of skill. *Arkansas Valley Smelting Co.* v. *Belden Mining Co.*, 127 U.S. 379. Before they had any contractual rights which they could sell, they were obligated to perform services for the company. All past services had been fully paid for and there was no due and unpaid amount to constitute a chose in action subject to assignment. On April 2, 1929, there was a right of petitioners to continue to perform service and then to be paid—to persist in their contractual relation for its agreed term. While this right is property in the constitutional sense in that it could not be arbitrarily legislated away, it is not capital. *Beals* v. *Commissioner*, 82 Fed. (2d) 268. It is a continuing right which goes hand in hand with performance. Before performance it is in embryo, and after payment it is exhausted. Obviously it is not the sort of property which is susceptible of ownership for a length of time as is a share of stock, a bond, or a thing. * * *

See also, in this connection, *P. G. Lake, Inc.* v. *Commissioner, supra.*

Mortgage Company appears to argue that what it sold was goodwill, represented by potential additional business which it hoped to get through its contacts with the mortgagors who had made the New York Life loans. The difficulty with this argument is that, not only is there an absence of any evidence that the parties bargained with this in mind, but also that their Memorandum of Agreement of January 29, 1955, contains no indication of a sale and purchase of goodwill. (To the contrary, as already shown, that Memorandum of Agreement points to the transfer of a contingent right to earn future compensation as a servicing agent.) And in any event, there is no evidence which would furnish a basis for allocating any particular portion of the $121,841.11 to goodwill.

For all the foregoing reasons, we hold that the $121,841.11 which Cobbs-Allen corporation agreed to pay to Mortgage Company under their Memorandum of Agreement of January 29, 1955, did not represent consideration for the sale of a capital asset. Said amount represents consideration for the transfer of the contingent right to earn future compensation; and said amount is taxable as ordinary income. *General Artists Corporation, supra; Thurlow E. McFall, supra.* Inasmuch as Mortgage Company kept its books and reported its income on an accrual basis of accounting, the full amount of said $121,841.11 is includible in its income for its fiscal year ended September 30, 1955, during which year its right to said amount accrued. We sustain the respondent on this issue.

## II.

Under the second issue, we must determine the character of the $8,000 received by Realty Company from the Cobbs-Allen partnership, in the transaction between these two businesses which is described in our Findings of Fact. Petitioner contends that the $8,000 represents proceeds from the sale of a capital asset; while respondent determined, and here argues, that such sum represents a payment to Realty Company for its covenant not to compete in the future in writing fire and windstorm insurance on properties covered by the New York Life loans involved in issue I.

Here again, we are unable to find or identify any capital asset which actually was sold by Realty Company. Said company had no vested right to sell insurance on the properties covered by the New York Life loans. To be sure, the mortgagors of such loans were required to carry fire and windstorm insurance on their properties; but they were not required to procure such insurance through Realty Company. Also, there was no contract between Mortgage Company and Realty Company, which required the former to refer any mortgagors to Realty Company for their insurance needs. The most that can be said of Realty Company's position is, that its opportunity to procure such insurance business was enhanced by the fact that it and the Mortgage Company were related companies which occupied the same business premises; and that after a policy of insurance was sold by Realty Company, it was in a favorable position to get the renewals of the same.

In our opinion, Realty Company did not part with any capital asset. As we have hereinbefore found, there is no evidence that Realty Company sold or transferred to Cobbs-Allen partnership any records or files relating to any policies which it had theretofore written. And the Memorandum of Agreement between it and said partnership did not call for the transfer of any such records or files or provide for the sale thereof. Also Realty Company did not cease to

carry on business as an insurance agent generally. As we see it, the real benefit which the Cobbs-Allen partnership received for its $8,000 payment, was Realty Company's covenant not to compete in seeking renewals of policies covered by New York Life loans. The law is well established that a payment received for a covenant not to compete is fully taxable as ordinary income. See *Richard Ullman*, 29 T.C. 129, and the cases therein cited and discussed.

Petitioner argues that *George J. Aitken*, 35 T.C. 227, is dispositive of the present issue, in its favor. We believe, however, that the *Aitken* case is distinguishable, and therefore that it does not control the disposition of the present issue. In that case, the taxpayer, a subagent, sold to an insurance agent by whom he was employed, certain "expirations" relating to fire and casualty insurance policies which the subagent had written. The "expirations" consisted of information pertaining to such policies which, as this Court found, derived their value from the facts that (a) such expirations enabled the agent to "control" the renewals of the policies, and "(b) the information is not available to any competitors of the agent." This Court held that, in such circumstance, the insurance "expirations" were property belonging to the taxpayer; that they were capital assets; and that when they were sold by him, the proceeds received therefor were capital gains.

In the instant case, on the other hand, Realty Company did not, so far as the record shows, transfer to Cobbs-Allen partnership any "expirations" or any other thing comparable thereto. Moreover, as shown by paragraph 8 of the servicing contract involved under the first issue, all policies of insurance covering the mortgaged properties, were forwarded to New York Life at the times the policies were written; and thereafter it was the duty of New York Life's servicing agent to see that such insurance was kept in force. Hence, it is obvious that all information regarding the amounts, the terms, and the expiration dates of the policies was fully available to these third parties, and did not constitute information which either was secret to the Realty Company alone, or which enabled it to "control" the renewals. Also, as shown by the Memorandum of Agreement involved under the present issue, the outstanding hazard policies on the New York Life loans were not to be molested by Cobbs-Allen partnership prior to the expiration of such policies; and all the Realty Company did, in substance, was to enter into a covenant not to compete with the Cobbs-Allen partnership, either in soliciting or in writing the renewals on such policies after their expiration.

We sustain the respondent as to this issue.

*Decisions will be entered for the respondent.*