HARRY M. FLOWER AND GAIL FLOWER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7432-70.    Filed October 31, 1973.

---

*Morgan Hunter*, for the petitioners.
*Robert H. Jones*, for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in petitioners' Federal income tax as follows:

| Year | Deficiency |
|------|------------|
| 1965 | $3,415.34 |
| 1966 | 5,057.73 |
| 1967 | 4,780.37 |

The issues for decision are: (1) Whether petitioners are entitled to capital gains treatment on payments received under a contract which purported to terminate a sales franchise agreement petitioner husband had with Rowell Laboratories, Inc.; and (2) whether petitioners are entitled to certain deductions for business expenditures made under a reimbursement agreement.

### FINDINGS OF FACT

Certain facts have been stipulated and are found accordingly.

Petitioners Harry M. and Gail Flower, husband and wife, filed joint Federal income tax returns for the years 1965, 1966, and 1967, with the district director of internal revenue at Austin, Tex. Petitioners resided in Port Aransas, Tex., at the time the petition was filed. Petitioner will hereafter refer to Harry M. Flower; Gail Flower is before the Court only because she signed the couple's joint returns.

From February 10, 1942, until August 1, 1961, petitioner served as a promotional and sales representative for Rowell Laboratories, Inc., formerly Burbot Liver Products Co., of Baudette, Minn., a manufacturer of pharmaceutical products. Hereafter, this concern will be referred to as Rowell. Rowell had been incorporated August 29, 1935, and was then engaged in the manufacture and sale of burbot (a fresh water fish of the cod family) liver oil, rich in vitamins A and D.

In January 1941, petitioner moved to the Minneapolis-St. Paul, Minn., area with tentative agreements to work as a sales representative for several manufacturers there. Petitioner first became associated with Rowell on February 10, 1942, when he began to promote the latter's products along with those of the other manufacturers he represented, all on a commission basis.

On July 18, 1944, petitioner and Rowell entered into the first of several written contracts relative to petitioner's representation of Rowell. The pertinent features of the agreement were that: (1) No specific territory was allotted to petitioner; (2) petitioner explicitly reserved the right to represent one other company in a sales capacity,

but was to be able to represent others only upon Rowell's written consent; (3) one-half of petitioner's commissions over $3,600 was to be spent by him directly on promoting the sale of Rowell's products to the pharmaceutical and medical professions; and (4) either party could terminate the agreement on advance notice of 3 months plus 1 month for every year the agreement lasted beyond 1944.

Promotional and sales efforts in the prescription drug industry are directed primarily at physicians, even though retail sales—and wholesale purchases, upon which petitioner's commissions depended—are made by pharmacists. Such promotional efforts are not based upon price competition, but on persuasion of the quality and purity of the drug in question.

Petitioner's first contacts with physicians in promotion of Rowell's products came through retail pharmacists with whom he had established close personal friendships. His practice thereafter was to build business in a particular area by establishing a nucleus of friends among local doctors and pharmacists and then to hire a salesman to take over the area. Petitioner and his salesmen depended heavily on regular, frequent personal contact with physicians to gain their confidence in, and assure them of the availability of, Rowell's products.

In December 1953, petitioner organized Harry M. Flower, Inc., a corporation of which petitioner was at all times president and sole shareholder. In February 1954, petitioner entered into a licensing agreement with the corporation under which the corporation was to perform all duties required of petitioner under his agreements with Rowell and was to receive all compensation petitioner was entitled to under the agreements, but petitioner reserved unto himself all provisions under the agreements relating to petitioner's death, disability, or retirement. The license agreement could be terminated by petitioner on 30 days' notice and it was agreed that the instrument did not constitute an assignment of the contracts with Rowell. Thereafter until August 1, 1961, the corporation performed petitioner's promotional and selling obligations under petitioner's contracts with Rowell, employed the salesmen, received the compensation due petitioner, and paid the related expenses. By 1961 there were eight salesmen, in addition to petitioner, performing the above functions as employees of the corporation. The corporation was dissolved after the termination of petitioner's contract with Rowel in 1961.

In 1946 and 1954, petitioner and Rowell executed agreements which substantially specified and then increased petitioner's sales territory. Rowell consented to petitioner's licensing of the corporation, Harry M. Flower, Inc., to perform his sales duties. Petitioner, however, was required to be in his territory personally performing his duties 30 weeks

per year from 1954 to 1959 and was to spend one-half of his commission income directly on promoting sale of Rowell's products. Rowell could terminate the agreements upon 6 months' notice for petitioner's disability to perform; either party could terminate upon 30 days' notice for default of the other party.

On December 21, 1955, petitioner and Rowell executed an agreement incorporating and modifying their earlier agreements. The new contract provided, in pertinent part:

WHEREAS, the parties hereto do desire to enter into a new agreement incorporating the original agreement of January 1, 1946 and all changes and modifications thereto to facilitate the interpretation of said contract of January 1, 1946 and contracts supplemental thereto, and

WHEREAS, the parties hereto desire to make certain modifications and amendments to the foregoing agreements and the agreements supplementary thereto, and

WHEREAS, Flower has expended large sums since the 1st day of January, 1946 in developing his selling organization and in promoting and selling the products of Manufacturer [Rowell] and has invested substantial sums in said organization,

NOW THEREFORE, in consideration of the respective covenants herein contained and the sum of One Dollar ($1.00) in hand paid by Flower to the Manufacturer, the receipt whereof is hereby acknowledged, the parties hereto agree as follows:

1. The Manufacturer agrees to appoint Flower and Flower agrees to act in the capacity of an independent contractor as the promotional and selling representative of the Manufacturer in the States of Minnesota, North Dakota, South Dakota, Texas, the northern peninsula of Michigan, and such portions of the northern portion of the State of Wisconsin and the eastern portion of the States of Montana and Wyoming as the parties hereto have or shall agree upon from time to time, and Flower shall so act during the life of this agreement for the sale of pharmaceutical or drug products of the Manufacturer for human consumption. * * *

2. Flower agrees to represent and promote the sale of said products within said territory to wholesale and retail drug companies or drug merchandisers and to the medical profession to the best of his ability, energy and skill. Flower may use his own methods for carrying out the terms of this agreement and for the sale of said products so long as they are not in conflict with the policies and methods of Manufacturer and need devote only such time thereto as he deems necessary, except as is hereinafter provided. Flower agrees not to represent, handle or sell any other products of a competitive or non-competitive nature. Flower further agrees that he and his licensee shall devote all of their ability, energy and skill exclusively for the promotion and sale of the products of Manufacturer and that all salesmen employed by Flower or his licensee shall likewise devote all of their ability, energy and skill exclusively for the promotion and sale of the products of Manufacturer. It is understood that Flower shall have the right to employ, at his own expense, salesmen to assist him in the promotion and sale of such products within said territory. Such salesmen shall be employees of Flower and not of the Manufacturer, and the Manufacturer shall have no right to supervise the activities of Flower or of his salesmen, except to see that the terms of this agreement are being performed. * * *

3. The Manufacturer shall pay Flower a commission on all eligible sales as defined in Subparagraph (a) hereof. * * *

(a) Eligible sales upon which a commission shall be paid hereunder shall include all sales of all products of the Manufacturer for human consumption made by or on behalf of the Manufacturer in the States of Minnesota, North Dakota, South Dakota, Texas, the northern peninsula of Michigan and the portions of northern Wisconsin and eastern Montana and Wyoming as hereinabove set forth, during the life of this agreement, * * *

*     *     *     *     *     *     *

5. Flower agrees that he or his licensee will expend in each calendar year an amount equal to at least 50% of the net amount of commission credited to his account or the account of his licensee during such calendar year for the purpose of promoting the sale of products of the Manufacturer to the drug trade and the medical profession, such expenditures to include salaries and expenses of salesmen and other employees assisting him in his duties hereunder, his personal travel and other expenses in connection with such duties, advertising expense incurred by him in connection with such duties, entertainment expense incurred by him in connection with such duties, and other ordinary and necessary expenses incident to the carrying on of his business. It is agreed that such expenditures may be made by Flower through his licensee. Flower further agrees to furnish the Manufacturer with a detailed statement of such expenditures for each quarter calendar year not later than 30 days after the expiration of such quarter calendar year.

6. This agreement shall continue in force until December 31, 1970, unless sooner terminated by the death of Flower or in accordance with the provisions of this paragraph. In the event Flower becomes disabled for any reason to such an extent that he is unable to perform substantially all his duties under this agreement, the Manufacturer may by written notice to him at any time thereafter terminate this agreement as of the date specified in such notice not less than six (6) months from the date of mailing such notice, unless such disability shall have ceased to exist by the date specified in such notice. In the event of such termination on account of death or disability of Flower or other termination by Manufacturer, the Manufacturer agrees, notwithstanding such termination, to pay to Flower each year thereafter, to and including the year ending December 31, 1970, or to his estate if he shall die prior to said date, an amount equal to 10% of the net commissions credited to the account of Flower, or his licensee, during the calendar year preceding the year in which such termination became effective, such annual payments to be made in equal monthly installments on the 1st day of each calendar month, and to be pro-rata, if necessary, for the year in which such termination became effective; provided, however, that in the event this agreement is so terminated subsequent to December 31, 1960, that Flower or his estate shall receive said payments for a period of not less than 10 years.

7. Flower does agree for himself, his personal representatives, heirs and assigns, that in consideration of the aforementioned payments, upon termination as above provided, he will transfer, assign and convey all his right, title and interest in the capital stock of licensee and in his business records and business data to Manufacturer or to any person or firm designated by Manufacturer.

8. In the event either party hereto becomes in default in the performance of any agreement to be by such party performed hereunder, and said default constituting a substantial failure of performance, the other party hereto may terminate this agreement by written notice to the party in such default as of the date specified in such notice not less than 30 days from the date of mailing such notice, unless all such defaults specified in such notice shall have ceased to exist by the date

specified in such notice. It is expressly understood, however, that should Manufacturer so terminate that he shall be liable for the payments to Flower or his estate as hereinabove set forth.

\* \* \* \* \* \* \*

11. Flower hereby agrees that, except in event of his death or of his disability to perform substantially all of his duties under this agreement:

(a) He will, during the 5 years commencing January 1, 1954, personally be present and performing his duties under this agreement during periods aggregating at least 30 weeks in each such calendar year in the States of Minnesota, North Dakota, South Dakota, Texas and in portions of the States of Michigan, Wisconsin, Montana and Wyoming covered by this agreement; provided, however, that for the purposes of this paragraph his summer camp in the Lake of the Woods area in Canada shall be considered as being within said States.

(b) He will, so long as said license agreement remains in effect and prior to termination as above provided, own of record and beneficially, all of the voting stock of said licensee and will act as President and General Manager thereof. Performance by Flower of the covenants by him contained in this paragraph are the conditions upon which the Manufacturer consents to said license agreement and the parties hereto understand and agree that a breach of any said conditions by Flower shall constitute just cause for termination by the Manufacturer of said agreement of January 1, 1946 and supplements thereof as is herein combined, any provision therein to the contrary notwithstanding \* \* \*

On December 11, 1958, petitioner and Rowell entered into an agreement supplementing and extending for a 10-year period the contract of December 21, 1955. The 1958 agreement extended petitioner's sales territory, and amended the termination provisions of the 1955 contract as follows:

Paragraph six of \* \* \* [the 1955] agreement hereby amended to read as follows:

(6) This agreement shall continue in force until December 31, 1980, unless sooner terminated by the death of Flower or in accordance with the provisions of this paragraph. In the event Flower becomes disabled for any reason to such an extent that he is unable to perform substantially all his duties under this agreement, the Manufacturer may, by written notice to him at any time thereafter, terminate this agreement as of the date specified in such notice not less than 6 months from the date of mailing such notice, unless such disability shall have ceased to exist by the date specified in such notice. In event of such termination on account of death or disability of Flower or other termination by Manufacturer, the Manufacturer agrees, notwithstanding such termination, to pay to Flower each year thereafter to and including the year ending December 31, 1980, or to his estate, if he shall die prior to said date, an amount equal to 10% of the net commissions credited to the account of Flower, or his licensee, during the calendar year preceding the year in which such termination became effective. In no event, however, shall said annual amount exceed $18,000.00 per year. Such annual payments to be made in equal monthly installments on the 1st day of each calendar month, and to be pro-rata, if necessary, for the year in which such termination became effective; provided, however, that in the event this agreement is so terminated subsequent to December 31, 1970, that Flower or his estate shall receive said payments for a period of not less than 10 years. In the

event of such termination on account of death or disability of Flower, or other termination by Manufacturer on or before December 31, 1968, it is agreed by and between the parties that the aforementioned benefits payable to Flower of [or] his estate will be paid for a period of twelve (12) years and upon the termination of period will cease.

In 1961 petitioner was living in Austin, Tex., and was directing sales operations in his northern territory by making frequent flights to his office in St. Paul, Minn. Petitioner's activities in the north consisted of attending to paperwork in his office, contacting personal accounts which, through friendship, he had retained for his individual attention in the Minneapolis-St. Paul area, and spending some time working with his salesmen in the field. Petitioner's health suffered from this routine: flights between Texas and Minneapolis were often turbulent, and petitioner not only felt under pressure from the stresses of business, but had developed painful back ailments which were aggravated by Minnesota winters.

On February 24 and 27, 1961, Theodore H. Rowell, Sr., then chairman of the board of Rowell, wrote to petitioner advising him that the agreement between petitioner and Rowell was in default. Petitioner was not, in fact, in default; Rowell desired to terminate its agreement with petitioner because it felt that it could manage petitioner's territory better than petitioner, living in Texas, could.

On March 9, 1961, petitioner wrote to Theodore H. Rowell, Sr., and denied that he was in default. In July 1961, petitioner was a guest at Theodore H. Rowell, Sr.'s cabin at Lake of the Woods, Minn. During casual but lengthy discussions there, petitioner decided to accept Rowell's offer to terminate the contract, basically for family and health reasons.

On August 1, 1961, petitioner and Rowell entered into an agreement covering the termination. The agreement referred to the 1955 and 1958 contracts between the parties, and continued, in pertinent part, as follows:

WHEREAS, the aforesaid agreements recognize that Flower had expended large sums in the development of a sales organization and in promoting and selling the products of manufacturer and had invested substantial sums in said organization and having recognized the foregoing did give and grant to Flower certain benefits in the event of a termination of said agreement without cause, and

WHEREAS, it is the desire of the parties hereto to terminate the aforesaid agreements according to the provisions thereof and to transfer and assign said sales organization and franchise to Manufacturer [Rowell].

Now, THEREFORE, it is agreed as follows in consideration of the mutual covenants of the parties hereto:

1. The Manufacturer does agree to pay to Flower in consideration of the termination of the aforesaid agreements and the transfer and assignment of said sales organization and franchise to Manufacturer, the sum of Two Hundred

Sixteen Thousand ($216,000) Dollars. Said sum shall be paid by Manufacturer to Flower, or to his estate in the event of his death, in monthly payments of Fifteen Hundred ($1500) Dollars per month, commencing with the first day of the month following the execution of this agreement and continuing * * * until the sum of Two Hundred Sixteen Thousand ($216,000) Dollars has been paid in full. Said sum of Two Hundred Sixteen Thousand ($216,000) Dollars shall bear no interest.

* * * * * * *

4. That from and after the date hereof, Flower will be relieved from any and all of the obligations, terms and conditions of the aforesaid agreements dated the 21st day of December 1955, and the 11th day of December 1958. Flower does agree that he does hereby transfer to Manufacturer all of his business records and business data in connection with the sale and promotion of Manufacturer's products. It is agreed, however, that save and except for such business records and business data that Flower will retain all other assets of his licensee, Harry M. Flower, Inc., or which he may personally own. Flower, as sole stockholder of Harry M. Flower, Inc., does further agree that he will cause said Harry M. Flower, Inc., to be voluntarily dissolved and the assets thereof distributed to Flower after provision has been made for the payment of all creditors of said Harry M. Flower, Inc.

Goodwill was not explicitly an element of the negotiations that culminated in the 1961 agreement and the agreement made no reference to goodwill or a covenant not to compete.

Immediately after August 1, 1961, seven of the salesmen (all of them except petitioner's son) accepted invitations by Rowell to associate with it as independent contractors, each keeping the territory he had been assigned in petitioner's organization. None of the seven had enjoyed independent contractor status with petitioner; each had been a salaried employee. Each salesman kept the records he had accumulated while employed by Harry M. Flower, Inc., when he contracted directly with Rowell.

Petitioner received $18,000 from Rowell in each of the years here involved under the terms of the termination agreement. Petitioners reported the $18,000 received from Rowell under the 1961 agreement as long-term capital gain from the sale of a "Franchise with Rowell Laboratories on each of their tax returns for the years 1965, 1966, and 1967. Rowell entered the payments on its books as "commissions" paid under the 1961 agreement. In the notice of deficiency respondent determined that the $18,000 payments received from Rowell represented ordinary income to petitioners from the cancellation of a contract to render services.

The 1961 agreement did not terminate petitioner's relationship with Rowell: thereafter, petitioner took over a sales territory in southern Texas representing Rowell, and operated in it individually on a part-time, commission basis. On July 30, 1965, petitioner and Rowell entered into another agreement, whereby petitioner was formally as-

signed, as an independent contractor, a sales territory consisting of 51 counties in southern Texas. The 1965 agreement provided that petitioner was to submit itemized accounts of his business expenses and that such expenses would be repaid to petitioner—

his personal representative, heirs or assigns over a ten (10) year period in ten equal annual installments without interest on the earliest of the following events to occur:

    (a) The expiration of this agreement on the 31st day of July 1985.

    (b) Physical or mental disability of Flower to the degree that Flower is unable to substantially perform his duties under this agreement.

    (c) The voluntary retirement of Flower.

    (d) The death of Flower.

The 1965 agreement remained in effect as of the date of trial in the instant proceedings; no payments had been made in reimbursement of petitioner's expenses, nor had funds been set aside for that purpose in any escrow fund, as of that date.

Petitioners claimed as ordinary and necessary business expenses on their tax returns for the years indicated the following amounts which were subject to future reimbursement under the 1965 contract:

| Year | Deduction |
|---|---|
| 1965 | $3,791.68 |
| 1966 | 8,425.35 |
| 1967 | 7,764.83 |

The expenditures so claimed were ordinary and necessary and were incurred in connection with petitioner's business activities. Respondent disallowed the deductions on the ground that the reimbursement feature of the 1965 contract rendered them nondeductible.

### OPINION

The first issue is whether the $18,000 received by petitioner from Rowell during each of the years 1965, 1966, and 1967 pursuant to the terms of the 1961 agreement terminating petitioner's sales franchise agreements with Rowell is taxable to petitioner as capital gain or ordinary income.

While the Court of Appeals for the Fifth Circuit, to which an appeal of this case would normally lie, has seemingly not been entirely consistent in its approach to this issue under somewhat similar factual circumstances, see concurring opinion of Brown, *J.*, in *United States* v. *Dresser Industries, Inc.*, 324 F. 2d 56, 61 (C.A. 5, 1963), the prevailing opinion of that court recognizes the legal principle that consideration received for the transfer of a contract right to receive income for the performance of personal services, is taxable as ordinary income. See *General Guaranty Mortgage Co.* v. *Tomlinson*, 335 F. 2d 518 (C.A. 5, 1964); *United States* v. *Woolsey*, 326 F. 2d 287 (C.A. 5,

1963) ; *Bisbee-Baldwin Corporation* v. *Tomlinson*, 320 F.2d 929 (C.A. 5, 1963) ; *United States* v. *Eidson*, 310 F. 2d 111 (C.A. 5, 1962). But compare *Nelson Weaver Realty Co.* v. *Commissioner*, 307 F.2d 897 (C.A. 5, 1962), reversing 35 T.C. 937 (1961) ; *United States* v. *Dresser Industries, Inc., supra.* We agree with this principle and find strong support for this position in *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260 (1958). See *Robert E. Foxe*, 53 T.C. 21 (1969) ; *Joseph W. Brown*, 40 T.C. 861 (1963) ; and also compare *Estate of John F. Shea*, 57 T.C. 15 (1971). In *Vaaler* v. *United States*, 454 F.2d 1120 (C.A. 8, 1972), the Court of Appeals for the Eighth Circuit also adopted this principle.

While we recognize that the courts have discussed certain subsidiary issues in deciding these cases, such as whether a contract to perform personal services is a capital asset, whether the relinquishment or cancellation of rights under such a contract is a "sale or exchange," and whether that which was transferred was a bundle of rights which included some capital assets, we find it unnecessary to discuss these issues in detail in this opinion because we are convinced from the record that the consideration petitioner received for termination of his contract was a substitute for ordinary income he would have received had the contracts not been terminated, and nothing else. Thus, we conclude, the entire amounts received are taxable as ordinary income and there is no need for allocation, as suggested in *Bisbee-Baldwin Corporation* v. *Tomlinson* and *United States* v. *Woolsey*, both *supra.*

We note that the $216,000 consideration petitioner is to receive for terminating the contract was the maximum amount Rowell agreed to pay petitioner under the 1958 agreement in the event of termination of the agreement by the "death or disability of Flower or other termination by Manufacturer." The amount to be paid was 10 percent per annum of the net commissions paid to petitioner or his licensee during the calendar year preceding the year in which the termination became effective, limited to $18,000 per year. The parties have stipulated that the net commissions credited by Rowell to petitioner or his licensee in the calendar year 1960 exceeded $180,000. Under the 1958 agreement these annual payments were to be paid for 12 years, which would total $216,000. Theodore H. Rowell, Sr., president of Rowell from 1949 to 1961, and chairman of the board until 1966, testified that the above provision was put in the contract at the instance of petitioner and was agreed to by Rowell because Rowell had no pension plan at the time and looked at this provision as a substitute for a pension plan.

Petitioners argue that the disposition of a personal service business, including its contract rights to perform future service, may well also include a disposition of capital assets, including specifically goodwill, and that in such case the bundle of rights disposed of must be "comminuted into its fragments"[1] and the sales price fairly allocated among the various fragments with the portion allocated to capital assets being taxed as capital gain. They then argue that in this case petitioner had a proprietary equity interest in the goodwill that had been developed towards Rowell's products among physicians and pharmacists through petitioner's efforts, and that the consideration paid to petitioner upon termination of this contract was for this interest in goodwill, a capital asset. We agree with the legal principle stated in the first sentence of this paragraph but disagree with the application of that principle made in the second part of petitioner's argument.

There is no doubt that goodwill for Rowell's products had been built up by petitioner's efforts. But this was goodwill that attached to the manufacturer and its products in which petitioner had no interest that he could transfer. This is peculiarly true under the circumstances here involved where the products petitioner was representing were not sold directly to consumers and petitioner had no contact with the consumers. Building up physicians' confidence in Rowell's products was what petitioner was being paid to do while operating under contract. Petitioner was paid a commission on all of Rowell's products sold in his territory even though he had had no direct contact with the consumer-purchaser. Having been paid to build up goodwill for Rowell's products petitioner had no interest therein; and there was no reason for Rowell to pay petitioner for goodwill, except as a substitute for the ordinary commission income petitioner would have received by continuing under the contract. Petitioner had already transferred whatever interest he may have had in the physicians' goodwill toward Rowell's products prior to termination of the contract.

Nor did petitioner transfer any personal goodwill he may have built up through his contacts with prescribing physicians. The termination agreement did not require petitioner to continue boosting Rowell's products with his physician friends, nor to introduce his successor to the physicians, nor did it contain a covenant not to compete. *Vaaler* v. *United States, supra.*

Furthermore, the termination agreement specifically provided that except for business records and business data petitioner would retain all other assets of his licensee and which he might personally own.

---

[1] See dissenting opinion in *Nelson Weaver Realty Co.* v. *Commissioner,* 307 F.2d 897 (C.A. 5, 1962), approved in *Bisbee-Baldwin Corporation* v. *Tomlinson,* 320 F.2d 929 (C.A. 5, 1963), and *United States* v. *Woolsey,* 326 F.2d 287 (C.A. 5, 1963).

The termination agreement did contain a provision that petitioner "does hereby transfer to Manufacturer all of his business records and business data in connection with the sale and promotion of Manufacturer's products," and it might be argued that petitioner transferred an operating business, including a sales force, to Rowell. However, the record does not support this argument. The evidence reflects that Rowell was currently given all the data and information with respect to petitioner's contacts and sales activities and would have had no need for petitioner's records. Also the record indicates that no books and records were actually transferred by petitioner to Rowell. With reference to petitioner's sales organization, which under the contract petitioner was entitled to build without interference from Rowell, it is clear that neither petitioner nor his corporation had any employment contracts with the sales employees and they were free to leave petitioner to work for Rowell at any time they wished. All of them, except petitioner's son, did become independent contractors for Rowell and apparently took their own records with them, but there is no indication that this was required or came about directly as a result of the termination agreement.

Petitioner did not transfer a franchise and a going business to a third party as was the situation in *Nelson Weaver Realty Co.* v. *Commissioner, supra*. Petitioner simply released to Rowell the right to represent Rowell in a given territory and to receive commissions on the sales of Rowell's products within that territory. Those commissions would have been taxable to petitioner as ordinary income. The payments petitioner did receive under the termination agreement were simply a substitute for the income he would have received for performing personal services under the contract and the fact that under the termination agreement petitioner did not have to perform services does not convert the personal services contract which petitioner relinquished into a capital asset. In short nothing in the "bundle of rights" relinquished or transferred by petitioner qualifies as a capital asset and hence the entire consideration received therefor is taxable as ordinary income. *Roscoe* v. *Commissioner*, 215 F.2d 478 (C.A. 5, 1954), affirming a Memorandum Opinion of this Court; *United States* v. *Eidson, supra; Bisbee-Baldwin Corporation* v. *Tomlinson, supra; United States* v. *Woolsey, supra; Vaaler* v. *United States, supra*.

The second issue in this case concerns a contract entered into by petitioner and Rowell in 1965 which designated several counties in southwest Texas as a sales territory for petitioner and which provided, so far as pertinent here, that petitioner's business expenses incurred in covering that territory would be reimbursed by Rowell over a 10-year period beginning at the earliest of: (1) The expiration of the 1965

contract on July 31, 1985; (2) petitioner's physical or mental disability; (3) petitioner's voluntary retirement; and (4) petitioner's death.

Petitioners claimed deductions for such expenses as follows:

| Tax year | Deduction claimed |
|---|---|
| 1965 | $3, 791. 68 |
| 1966 | 8, 425. 35 |
| 1967 | 7, 764. 83 |

Respondent does not question that the expenses were incurred for business purposes but disallowed the claimed deductions "for the reason that these expenses were incurred under a reimbursement arrangement with Rowell Laboratories, Inc., and therefore did not represent ordinary and necessary expenses of your business."

We conclude that the respondent's disallowance was proper. "It has been firmly established that where a taxpayer makes expenditures under an agreement that he will be reimbursed therefor, such expenditures are in the nature of loans or advancements and are not deductible as business expenses." *Josef C. Patchen,* 27 T.C. 592, 600 (1956). And see *Adolph B. Canelo III,* 53 T.C. 217, 223–224, 226 (1969), affirmed per curiam 447 F.2d 484 (C.A. 9, 1971). This rule has been followed even when the right to reimbursement was contingent, the advances being "made only with the expectation that they would be substantially repaid," *Burnett* v. *Commissioner,* 356 F.2d 755, 760 (C.A. 5, 1966). See also *Levy* v. *Commissioner,* 212 F.2d 552, 554–555 (C.A. 5, 1954); *Universal Oil Products Co.* v. *Campbell,* 181 F.2d 451, 475 (C.A. 7, 1950).

The reason for not allowing a deduction under the above principle is that the expenditures, being in the nature of advances or loans to a third party, are not expenses of the taxpayer's business. See *Burnett* v. *Commissioner, supra* at 759, where the court said: "Here there is no occasion to define the expenditures precisely, and it is enough to determine negatively that they were not expenses of petitioner's business when made." There is no doubt that under the 1965 agreement Rowell was unconditionally obligated to reimburse petitioner for the expenditures here involved.[2] Thus, under the decided cases petitioners are not entitled to the deductions claimed unless it can be shown that the above principle is not applicable in this case.

Petitioners launch a two-pronged attack against the use of the above-stated principle to disallow the deductions. First, they argue that petitioner's right to repayment is not an actual right of reimbursement and

---

[2] While the agreement called for Rowell's quarterly approval of expenditures that would be reimbursed there is no evidence that the expenses here involved were not approved for reimbursement by Rowell—and the point is not raised by either party.

hence the principle is not applicable. Second, they argue that the principle as stated in the above-cited cases is contrary to section 62 of the Internal Revenue Code, and those cases should not be followed.

Petitioners' first argument that the expenditures here involved do not really represent "reimbursable" expenses is based on the fact that petitioner's right to repayment (1) is deferred for a considerable period, (2) is non-interest-bearing, (3) is not evidenced by a note or other evidence of indebtedness, (4) is nonnegotiable, and (5) is utterly unbankable. Petitioners' argument does not specifically utilize the last three items mentioned above; we can only infer that they are mentioned to indicate that the right to repayment is not in the nature of a loan because it is not represented by the usual evidence and attributes of a commercial loan. If this inference is correct, we need point only to *Burnett* v. *Commissioner, supra,* wherein the court pointed out that cases dealing with the question of what constitutes a debt for purposes of section 166 are not apposite to the issue there, and here, involved, which is what constitutes an expense for purposes of section 162(a). We add that the principle stated above does not use the word "debt" but only the words "in the nature of loans or advancements."

Petitioners do argue that because Rowell's obligation is to repay petitioner in 1980 the same amount of dollars he spent in 1965, without interest, which dollars discounted for lapse of time, would have a 1965 value of only $48, petitioner's right is not a right of "reimbursement." Petitioner quotes a dictionary definition of "reimburse" to mean a restoration of an equivalent or a making whole; and claims that petitioner will not be repaid an equivalent and thus has no right of "reimbursement." This argument proves nothing because it is clear that petitioner is entitled to receive an equivalent amount of dollars back at a later date and will be made whole. The fact that the dollars to be received in 1980 may have a present value of less than the dollars being currently spent does not mean the receipt of those dollars in 1980 will not qualify as a reimbursement, even under a dictionary definition. The ordinary 10-year commercial loan made by a bank requires the repayment of only the same amount of dollars loaned. The interest charged for the use of the money compensates for the discount feature used by petitioner. Here, we do not know why petitioner did not insist on interest being paid on his advancements. If the choice was not his we must assume that he received something else of value under the agreement that compensated him for the deferral in reimbursement without interest.

Petitioners cite *Mooney Aircraft, Inc.* v. *United States,* 420 F. 2d 400 (C.A. 5, 1969), for the proposition that analogous reasoning "should forbid analysis of the case at bar under the cases concerning reimbursable expenses 'in the nature of loans.' " We fail to see the analogy.

In *Mooney* an aircraft manufacturer issued a "Mooney Bond" for $1,000 upon each sale of an aircraft. The bond was payable to the bearer when the corresponding aircraft should be permanently retired from service. The taxpayer sought to deduct or exclude from gross income the face value of the bonds in the year they were issued. The Court rejected the Government's argument that the bonds did not represent fixed obligations of the taxpayer when issued but went on to hold for the Government on the ground that, because of the long delay for redemption of the bonds, the Commissioner's determination that the deduction or exclusion of the face amount of the bonds from gross income in the year issued would not clearly reflect income. In that case there was no doubt that the ultimate redemption of the bonds would be an expense of the taxpayer's business; the only question was when it was deductible. Here the question is whether the expenditures, in light of the reimbursement agreement, were petitioner's business expenses. Furthermore, in this case the respondent has made no such determination as was upheld in the *Mooney* case.

The second prong of petitioners' attack is on the validity of the principle established in the cited cases. In support of this argument petitioners turn to section 62(2) (A) of the Code. Section 62 defines "adjusted gross income" as gross income minus the following deductions, one of which is—

(2) TRADE AND BUSINESS DEDUCTIONS OF EMPLOYEES.—

(A) REIMBURSED EXPENSES.—The deductions allowed by * * * [sec. 161 *et seq.*] which consist of expenses paid or incurred by the taxpayer, in connection with the performance by him of services as an employee, under a reimbursement or other expense allowance arrangement with his employer.

Petitioner argues that the principle that reimbursable expenses are, per se, nondeductible is contrary to the above section, and the cases espousing that principle should not be followed. The short answer to this argument is that neither this case nor the cited cases deal with reimbursed expenses of *employees* and cannot be said to stand for the principle that reimbursed expenses of employees are nondeductible. Paragraph (2) (A) is specifically limited to "employees" while this case and the cited cases involve individuals or corporations engaged in business. If reference need be made to section 62 in these cases, paragraph (1) would be the appropriate reference. Furthermore, paragraph (2) (A) clearly contemplates that if an employee's reimbursable expense is deductible, the reimbursement will be included in gross income. See sec. 1.62–1 (f) (2), Income Tax Regs.

We will not rely on such a tenuous argument to discredit the long line of cases which establish the principle that under circumstances such as are here present where a taxpayer makes expenditures under an agreement that he will be reimbursed therefor, such expenditures

are in the nature of loans or advancements and are not deductible as business expenses. Those cases are controlling here and require us to sustain respondent on this issue. We recognize that this conclusion may at first blush seem harsh on petitioner, who made the expenditures in the years before us and may not be repaid for a number of years, without interest. However, petitioner entered into the agreement for reasons of his own (which might include the possibility of a tax advantage if he could deduct the expenses when paid and include the repayment in income in later years) and he must abide by it.

*Decision will be entered for the respondent.*